1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11 HAISANI REYNOLDS, CDCR #AN-9755, | Case No. 3:21-cv-00955-BAS-RBB |

HAISANI REYNOLDS,
CDCR #AN-9755,

Plaintiff,

v.

RAYMOND MADDEN, *et al.*,

Defendants.

Case No. 3:21-cv-00955-BAS-RBB

**ORDER:**

 **(1)  GRANTING MOTION TO PROCEED IN FORMA PAUPERIS (ECF No. 2);**

**(2)  DISMISSING COMPLAINT FOR FAILING TO STATE A CLAIM PURSUANT TO 28 U.S.C. § 1915(e)(2)(B) AND 28 U.S.C. § 1915A(b); AND**

**(3) GRANTING PLAINTIFF 60 DAYS LEAVE TO AMEND THE COMPLAINT**

Plaintiff Haisani Reynolds, incarcerated at Centinela State Prison ("CEN"), and proceeding pro se, has filed a civil rights Complaint ("Compl.") pursuant to 42 U.S.C. § 1983 ("Compl.").   (ECF No. 1.)   Reynolds claims that nearly three dozen CEN correctional and inmate appeals officials violated his First, Fourth, Eighth, and Fourteenth Amendment rights after he refused to "strip out" while a cell search was conducted in his

21cv955

housing unit on or around May 30, 2019.  Reynolds was patted down, subjected to metal detection, segregated during a two-day contraband surveillance watch ("CSW"), charged with a "false" serious rules violation ("RVR") for failing to provide a urine sample, and then placed on a mandatory drug testing list.  (*See* Ex. BB, ECF No. 4-3 at 9.)  The officers continued to cite Reynolds for refusing to submit to urine analysis, and Reynolds suffered several subsequent disciplinary convictions as a result.  (*See* Compl. at 1, 7, 14–15, 16–20; *see also* Pl.'s Decl. in Supp. of Compl. ("Pl.'s Decl."), ECF No. 5; Exs. BB, BC, BD, BE, BG, BI, BM to Compl., ECF No. 4-3 at 22, 37, 50, 82, 107–08, 131–32.)  Among others, Reynolds alleges that he was transferred to another prison in retaliation for filing complaints about the prison officers who mistreated him.  (Compl. at 20, ¶ 158.)  Reynolds seeks declaratory and injunctive relief, including his removal from the mandatory drug testing list, the restoration of custody credits and privileges forfeited due to his disciplinary convictions, and both general and punitive damages.  (*See* Compl. at 1, 23.)

Reynolds has not prepaid the filing fee required by 28 U.S.C. § 1914(a) to commence a civil action.  Instead, he has filed a Motion to Proceed In Forma Pauperis ("IFP") pursuant to 28 U.S.C. § 1915(a).  (ECF No. 2.)

## I.    MOTION TO PROCEED IFP

All parties instituting any civil action, suit or proceeding in a district court of the United States, except when applying for writ of habeas corpus, must pay a filing fee of $402.[1]  *See* 28 U.S.C. § 1914(a).  The action may proceed despite a plaintiff's failure to prepay the entire fee only if he is granted leave to proceed IFP pursuant to 28 U.S.C. § 1915(a).  *See Andrews v. Cervantes,* 493 F.3d 1047, 1051 (9th Cir. 2007); *Rodriguez v. Cook*, 169 F.3d 1176, 1177 (9th Cir. 1999).  The fee is not waived for prisoners, however.

---

[1] Effective December 1, 2020, civil litigants must pay an additional administrative fee of $52, in addition to the $350 filing fee set by statute. *See* 28 U.S.C. § 1914(a) (Judicial Conference Schedule of Fees, District Court Misc. Fee Schedule, § 14 (eff. Dec. 1, 2020)). The $52 administrative fee does not apply to persons granted leave to proceed IFP. *Id.*

If granted leave to proceed IFP, the prisoners nevertheless remain obligated to pay the entire fee in "increments" or "installments," *Bruce v. Samuels*, 577 U.S. 82, 84 (2016); *Williams v. Paramo*, 775 F.3d 1182, 1185 (9th Cir. 2015), and regardless of whether their actions are dismissed for other reasons.  *See* 28 U.S.C. § 1915(b)(1), (2); *Taylor v. Delatoore*, 281 F.3d 844, 847 (9th Cir. 2002).

To qualify, Section 1915(a)(2) requires prisoners seeking leave to proceed IFP to submit a "certified copy of the trust fund account statement (or institutional equivalent) for . . . the 6-month period immediately preceding the filing of the complaint."  28 U.S.C. § 1915(a)(2); *Andrews v. King*, 398 F.3d 1113, 1119 (9th Cir. 2005).  From the certified trust account statement, the Court assesses an initial payment of 20% of (a) the average monthly deposits in the account for the past six months, or (b) the average monthly balance in the account for the past six months, whichever is greater, unless the prisoner has no assets. *See* 28 U.S.C. § 1915(b)(1); 28 U.S.C. § 1915(b)(4).  The institution having custody of the prisoner then collects subsequent payments, assessed at 20% of the preceding month's income, in any month in which his account exceeds $10, and forwards those payments to the Court until the entire filing fee is paid.  *See* 28 U.S.C. § 1915(b)(2); *Bruce*, 577 U.S. at 84.

In support of his IFP Motion, Reynolds has submitted a copy of his California Department of Corrections and Rehabilitation ("CDCR") Inmate Statement Report, as well as a prison certificate authorized by a CEN Accounting Officer Specialist.  (ECF No. 3.) *See* 28 U.S.C. § 1915(a)(2); S.D. Cal. Civ. L.R. 3.2; *Andrews*, 398 F.3d at 1119.  These documents show Reynolds had no money deposited to his trust account during the six months prior to the filing of the Complaint, and that he had no money to his credit when he did file suit.  (ECF No. 3 at 1, 3.)  Therefore, the Court **GRANTS** Reynolds's Motion to Proceed IFP (ECF No. 2), and declines to assess any initial filing fee because his trust account statements show he "has no means to pay it."  *Bruce*, 577 U.S. at 84–85.  Instead, the Court **DIRECTS** the Secretary of the CDCR to collect the entire $350 balance of the filing fees required by 28 U.S.C. § 1914 and to forward those fees to the Clerk of the Court

pursuant to the installment payment provisions set forth in 28 U.S.C. § 1915(b)(2).  *See id.*

## II.    SCREENING

### A.    Standard of Review

Because Reynolds is a prisoner and is proceeding IFP, his Complaint requires a preliminary review pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A(b).  Under these statutes, the Court must *sua sponte* dismiss a prisoner's IFP complaint, or any portion found frivolous, malicious, failing to state a claim, or seeking damages from defendants who are immune.  *See Lopez v. Smith*, 203 F.3d 1122, 1126–27 (9th Cir. 2000) (en banc) (discussing 28 U.S.C. § 1915(e)(2)); *Rhodes v. Robinson* ("*Rhodes III*"), 621 F.3d 1002, 1004 (9th Cir. 2010) (discussing 28 U.S.C. § 1915A(b)).  "The purpose of [screening] is 'to ensure that the targets of frivolous or malicious suits need not bear the expense of responding.'" *Nordstrom v. Ryan*, 762 F.3d 903, 920 n.1 (9th Cir. 2014) (citation omitted).

"The standard for determining whether a plaintiff has failed to state a claim upon which relief can be granted under § 1915(e)(2)(B)(ii) is the same as the Federal Rule of Civil Procedure 12(b)(6) standard for failure to state a claim." *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012); *see also Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012) (noting that screening pursuant to § 1915A "incorporates the familiar standard applied in the context of failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)").

Federal Rules of Civil Procedure 8(a) and 12(b)(6) require a complaint to "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *Wilhelm*, 680 F.3d at 1121.  Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  And while the court "ha[s] an obligation where the petitioner is pro se, particularly in civil rights cases, to construe the pleadings liberally and to afford the petitioner the benefit of any doubt," *Hebbe v. Pliler*, 627 F.3d 338, 342 & n.7

(9th Cir. 2010) (citing *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985)), it may not "supply essential elements of claims that were not initially pled." *Ivey v. Bd. of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982).[2]

### B.    Factual Allegations & Exhibits

Reynolds's Complaint is dense, and his exhibits are voluminous, but he separates his claims into Count 1 and Count 2.  (*See* Compl. at 7–15, 16–20.)

#### 1.    Allegations Regarding Count 1

In Count 1, Reynolds claims RJD Capt. J. Sais, Lt. J. Rodriguez, Sgt. R. Lam, Officer J. Verdugo, Sgt. D. Loop, Lt. R. Din, Sgt. J. Loshek, Officer D. Carillo, Officer M. Layvas, Sgt. Buttler, and two unidentified Doe Defendants subjected him to "vindictive" searches and "cruel and unusual punishment" in violation of the Fourth, Eighth, and Fourteenth Amendments beginning on May 30, 2019.  (*Id.* at 14–15.)

On that day, at 9:22 a.m., Reynolds claims Verdugo arrived at his cell and announced

---

[2] "Courts must consider the complaint in its entirety," including "documents incorporated into the complaint by reference" to be part of the pleading when determining whether the plaintiff has stated a claim upon which relief may be granted. *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007); *Schneider v. Cal. Dep't of Corrs*., 151 F.3d 1194, 1197 n.1 (9th Cir. 1998); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").  Courts need not, however, "wade through exhibits to determine whether cognizable claims have been stated." *Woodrow v. Cnty. of Merced*, 2015 WL 164427, at *4 (E.D. Cal. Jan 13, 2015); *see also Stewart v. Nevada*, 2011 WL 588485, at *2 (D. Nev. Feb. 9, 2011) ("The Court will not comb through attached exhibits seeking to determine whether a claim possibly could have been stated where the pleading itself does not state a claim. In short, [Plaintiff] must state a claim, not merely attach exhibits.").  In this case, Reynolds refers to specific exhibits with respect to each of his claims, and points the Court to them consistently throughout his pleading.  (*See e.g.,* Compl. at 7–19 & Exs. A–CY (ECF Nos. 4, 4-1, 4-2, 4-3 & 4-4).)  Therefore, the Court will consider Reynolds's exhibits in conjunction with its mandatory screening of his Complaint pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A.

a cell and strip search as part of a Facility C-4 Building search that had commenced two days before. (*Id.* at 7.) When Reynolds objected and requested that Verdugo and Lam provide justification for a strip search, Lam directed Verdugo to pat Reynolds down, and then instructed him to walk through a metal detector. (*Id.* at 8.) Reynolds contends Lam knew he would "medically fail to clear the device" due to an "implanted rod in his right leg." (*Id.*; *see also* Ex. G, ECF No. 4-1 at 73–76.) When Reynolds failed to clear the detector, Lam used a handheld metal detector, which Reynolds also failed to clear. (*See* Compl. at 8–9.) As a result, Verdugo cuffed Reynolds, escorted him to the program office, and placed him in a steel cage. (*Id.* at 9.) Lam returned with two white jumpsuits, directed Reynolds to put them on, and secured him in handcuffs, a waist chain, and leg restraints. (*Id.*) Verdugo then escorted Reynolds to Receiving & Release ("R&R"), where Sgt. Loop moved Reynolds through the "Adani Low-Dose Body Scanner" twice. (*Id.* at 10.) After both scans were complete, Verdugo escorted Reynolds to administrative segregation ("Ad-Seg").[3] (*Id.*)

At 10:00 a.m., Reynolds claims R. Din, a Lieutenant assigned to conduct Contraband Surveillance Watch ("CSW"),[4] removed Reynolds's restraints, placed him inside a single steel cage, and instructed him to "get naked." (*Id.*) Reynolds complied, and after Din

---

[3] Reynolds alleges he transferred to Ad-Seg "for no reason" because while he could not clear any of the metal detectors, none of them "detect[ed] anything []or made any determination of anything." (*See* Compl. at 8–10.) However, the CSW Placement Authorization Form CDC 128-B, which Reynolds attaches as Exhibit P, notes that while he "has a metal rod and bullet in his lower right tibia," he was recommended and approved for CSW placement by Lt. Rodriguez and Cpt. Sais on May 30, 2019 because he "continued to refused to submit to unclothed body search," and was unable to clear all three metal detection devices, two of which "register[ed]" and "revealed an anomaly *in his front pelvic area.*" (*See* ECF No. 4-1 at 138–139 (emphasis added).)

[4] "Contraband watch, also known as a 'body cavity search,' is a temporary confinement during which a prisoner is closely monitored and his bowel movements searched to determine whether he has ingested or secreted contraband in his digestive tract." *Chappell v. Mandeville*, 706 F.3d 1052, 1055 (9th Cir. 2013).

returned his clothing, Din re-secured his waist chain and handcuffs, taped his arms, waist, and ankles, re-applied leg restraints, and escorted him to a CSW isolation cell that "consist[ed] of nothing but a[n] iron bench, bright light, and cold temperature." (*Id.* at 11.) After "multiple hours," Reynolds informed the observation officer assigned to the second watch that he had to defecate. (*Id.*) He was then escorted to an open area, placed in another single steel cage, and ordered to remove all clothing except his boxer shorts and socks. (*Id.*) After his handcuffs and waist chain were re-secured, he was released from the cage, and allowed to defecate in a portable toilet and a plastic bag. (*Id.*) After the assigned observation officer searched his feces, Reynolds's jumpsuit and t-shirt was returned, he was re-secured and escorted back to the CSW isolation cell. (*Id.* at 12.)

During the third watch, "sometime after dinner was served at 4:00–5:00 p.m.," Reynolds informed Officer Layvas that he again needed to defecate. (*Id.*) CSW Sgt. Buttler and Officer Layvas then "repeated the exact same" protocols as the second watch before. (*Id.*) At "around 8:00 p.m.," Sgt. Buttler unlocked the isolation cell, and "tossed a mattress" on the floor.[5] (*Id.*) Because his lower back, arms, wrists, and legs were irritated by the restraints, Reynolds complained that he "c[ould] not sleep like this." (*Id.*) Officer Layvas responded: "You gotta do your best." (*Id.*)

At approximately 8:00 a.m. the following day, May 31, 2019, the mattress was removed from Reynolds's isolation cell. (*Id.* at 13.) During the third watch, after dinner at approximately 4:00–5:00 p.m., Reynolds again informed Officer Layvas of his need to defecate. Layvas and CSW Sgt. Loshek repeated the same procedures as the day before, and around 8:00 p.m., Loshek told Reynolds the CSW would be terminated. (*Id.*) Loshek removed Reynolds from the isolation cell, placed him in an Ad-Seg shower, and "minutes

---

[5] RVR Log No. 6857810 also indicates that at "approximately 1928 Hours" on May 30, 2019, Ad-Seg Sgt. Loshek ordered Reynolds to "provide a Urinalysis Sample (AU) for Probable Cause due to being placed on . . . CSW. Reynolds refused by stating 'I'm good on all that.'" (*See* Ex. BB, ECF No. 4-3 at 9.) Loshek "explained to Reynolds per DOM Section 52010.20 he would receive a CDCR 115 disciplinary write-up if he refused to produce the urine sample. Reynolds again refused the order." (*Id.*)

later," returned with a small bottle "claiming [CSW] requires urine collection." (*Id.*) Reynolds claims he told Loshek that the urine collection was not mandatory but Reynolds "urinated in the bottle anyway[,] and told Loshek 'I'm going to sue you.'" (*Id.*) Loshek re-secured Reynolds's waist chain and handcuffs and released him into the custody of two escort officers, including D. Carillo. (*Id.*) Carillo and the other unidentified officer transferred Reynolds to R&R, again requiring him to pass through the Adani Low-Dose Body Scanner. (*Id.*)

### 2.    Allegations Regarding Count 2

In Count 2, Reynolds again invokes his Fourth, Eighth, and Fourteenth Amendment rights and claims Sgt. Loshek, and Officers J. Barba, S. Torres, N. Preciado, and A. Hernandez all issued a series of "false RVRs" against him based on his refusals to provide urine samples on May 31, 2019 (Rules Violation Log ("RVR Log") No. 6857810), August 15, 2019 (RVR Log No. 6890922), January 7, 2020 (RVR Log No. 6953012), February 27, 2020 (RVR Log No. 6972817), and July 3, 2020 (RVR Log No. 7012801). (*Id.* at 16–20; Exs. BB, BC, BD, BE, BG, ECF No. 4-3 at 8–63, 81–95; *see also* Pl.'s Decl., ECF No. 5 at 16, 18, 21, 23, 27,  ¶¶ 87, 97, 112, 121, 140.)  Reynolds contends these five RVRs were contrived to "conceal CSW conditions" and were based on an unidentified Investigative Services Unit ("ISU") Doe Defendant's decision to "wantonly forg[e]" Reynolds's name on a "mandatory random drug testing list." (*See* Compl. at 20.)

Reynolds further alleges that (1) Defendants B. Perez, E. Sanchez, A. Zamora, J. Ruiz, and J. Bonillas "knowingly held blind and illegal disciplinary hearings," in response to all five RVRs and entered "arbitrary guilty findings"; (2) Associate Warden and Chief Disciplinary Officers Rock Johnson and J. Salcido "knowingly affirm[ed] [those] illegal disciplinary hearing actions"; (3) Inmate Appeals officials L. Santana, M. Garcia, and M. Juarez "perform[ed] stratagem acts to exploit exhaustion requirements," in response to every CDCR 602 grievance he filed, and "failed to correct officers' [i]nfringement[s]"; and (4) Officer A. Hernandez, Counselor J. Galindo, Chairperson S. McClain, and Committee

Staff Representative E. Moreno all "worked in union for [his] retaliatory transfer" during an April 2, 2020 Unit Classification Committee ("UCC") hearing.  (*Id.*; *see also* Pl.'s Decl., ECF No. 5 at 16–32, ¶¶ 87–160.)

## C.   Discussion

"Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights."  *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001).  "To establish § 1983 liability, a plaintiff must show both (1) deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138 (9th Cir. 2012).

### 1.   *Respondeat Superior* / **Personal Liability**

As a preliminary matter, the Court finds that Reynolds's Complaint fails to state any plausible claim for relief against either Warden Raymond Madden or Associate Director Felix M. Vasquez.  "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676; *Palmer v. Sanderson*, 9 F.3d 1433, 1437–38 (9th Cir. 1993) (noting there is no *respondeat superior* liability under 42 U.S.C. § 1983).  Supervisory officials like Madden and Vasquez may only be held liable under § 1983 if the plaintiff alleges their "personal involvement in the constitutional deprivation, or . . . a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  *Keates v. Koile*, 883 F.3d 1228, 1242–43 (9th Cir. 2018); *Starr v. Baca,* 652 F.3d 1202, 1207 (9th Cir. 2011).  In other words, "a supervisor is liable for the acts of his subordinates 'if the supervisor participated in or directed the violations, or knew of the violations of subordinates and failed to act to prevent them.'"  *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009) (citations omitted).

Reynolds merely includes Madden and Vasquez as parties in the caption of his pleading.  (*See* Compl. at 1.)  He fails to otherwise identify either of these parties, include any facts with respect to them, or describe even cursorily what role either of them played with respect to his strip searches, contraband watch, RVRs, inmate appeals, or his UCC classification hearing. While Federal Rule of Civil Procedure 8 "does not require 'detailed factual allegations,'" it "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citation omitted).  In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Iqbal*, 662 U.S. at 678 (citations omitted).  But nothing in Reynolds's Complaint plausibly suggests Madden or Vasquez "through his own individual actions, . . . violated the Constitution." *Iqbal*, 556 at 676; *see also Jones v. Cmty. Redev. Agency of City of L.A.*, 733 F.2d 646, 649 (9th Cir. 1984) (even pro se plaintiff must "allege with at least some degree of particularity overt acts which defendants engaged in" in order to state a claim).  Therefore, the Court *sua sponte* dismisses any purported claims against Madden and Vasquez pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and § 1915A(b)(1).  *See Watison* 668 F.3d at 1112; *Wilhelm,* 680 F.3d at 1121.

### 2.    Search, CSW Placement & Conditions Claims—"Count 1"

With respect to his May 31, 2019 strip search, CSW placement, and the conditions of his two-day CSW isolation, the Court finds that Reynolds has failed to allege any plausible violation of his Fourth, Eighth, or Fourteenth Amendment rights.

### a.    The Fourth Amendment

"The Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer*, 468 U.S. 517, 526 (1984), and courts have recognized only limited rights to bodily privacy in prison. *See Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 974–75 (9th Cir. 2010); *Mitchenfelder v. Sumner*,

860 F.2d 328, 332 (9th Cir. 1988).  Routine visual strip searches do not violate the Fourth Amendment.  *See Hudson*, 468 U.S. at 529 ("[W]holly random searches are essential to the effective security of penal institutions."); *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 327–28 (2012) ("[D]eterring the possession of contraband depends in part on the ability to conduct searches without predictable exceptions."); *Michenfelder*, 860 F.2d at 333–34 (upholding routine visual body cavity searches for contraband or weapons); *Nunez v. Duncan*, 591 F.3d 1217, 1227–28 (9th Cir. 2010) (finding that a random strip search on a federal prisoner for contraband did not violate the Fourth Amendment because "controlling contraband within a prison is a legitimate penological interest" and the regulation allowing visual strip searches was reasonably related to that interest).  Here, Reynolds claims Officer Verdugo requested that he submit to a cell and visual strip search on May 31, 2019, and that he refused to submit to "strip out" without first being provided some justification.  (*See* Compl. at 7–9; Pl.'s Decl. at 1–5, ¶¶ 1–22.)  Reynolds admits the searches were being conducted throughout his entire building facility over the course of two days in late May 2019.  (*See* Compl. at 7, ¶¶ 25–32.)  As alleged, the search on Reynolds was a part of a routine visual strip search.  Therefore, the search does not violate the Fourth Amendment.

Once Reynolds refused to submit to a visual body cavity search, however, he claims that Sgt. Lam conducted a pat-down over his gym and boxer shorts and then ordered him to clear metal detection.  (*See* Compl. at 8–9.)  The manner in which a bodily search is conducted may become so unreasonable that it can violate the Fourth Amendment, but Reynolds fails to allege facts to plausibly suggest that Lam patted him down or subjected him to any form of metal detection that was "excessive, vindictive, harassing, or unrelated to any legitimate penological purpose."  *Michenfelder*, 860 F.2d at 332–33; *see also Hudson*, 468 U.S. at 528 ("The uncertainty that attends random searches of cells renders these searches perhaps the most effective weapon of the prison administrator in the constant fight against the proliferation of knives and guns, illicit drugs, and other contraband.").  *Thompson v. Souza*, 111 F.3d 694, 700 (9th Cir. 1997) (upholding visual strip searches

conducted outside prisoner's cell as reasonably related to the legitimate penological interest in keeping drugs out of the prison); *cf. Cates v. Stroud*, 976 F.3d 972, 979–80 (9th Cir. 2020) (upholding routine suspicion-less pat-down searches and metal detector screenings as prerequisite for visitation privileges on Fourth Amendment grounds given "weighty institutional safety concerns" and because "[s]uch searches are 'relatively inoffensive' and 'less intrusive than alternative methods.'" (citing *McMorris v. Alioto*, 567 F.2d 897, 900–01 (9th Cir. 1978)).[6]

### b.    The Fourteenth Amendment

Reynolds further claims his placement on CSW caused a "liberty interference" and the two days he spent subject to restrictive CSW isolation resulted in an "atypical hardship" in violation of his Fourteenth Amendment rights. (*See* Compl. at 14–15.)   The Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."   U.S. Const. amend. XIV, § 1.   Liberty interests may arise from the Due Process Clause or from state law.   *See Hewitt v. Helms*, 459 U.S. 460, 466–68 (1983).

### i.    Liberty Interests Arising from the Due Process Clause

"[L]awfully incarcerated persons retain only a narrow range of protected liberty interests" under the Fourteenth Amendment itself.   *Id.* at 467.   Thus, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the

---

[6] Reynolds does allege that Sgt. Lam knew he would "medically fail to clear" metal detection due to an "implanted rod in [his] right leg," and Lam's "direct observations . . . during meal and yard releases." (*See* Compl. at 8.)   However, according to the May 30, 2019 CSW Placement Authorization, an exhibit Reynolds incorporates into his pleading by reference, both Lt. Rodriguez and Cpt. Sais acknowledged that Reynolds "has a metal rod and bullet in his lower right tibia," but nevertheless authorized CSW placement because "the metal detector and hand held wand . . . register[ed] around [his] pelvic area." (*See* Ex. P, ECF No. 4-1 at 139.)

sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes*, 427 U.S. 236, 242 (1976). Transfer to less amenable quarters or segregation for non-punitive reasons have been held to be "ordinarily contemplated by a prison sentence." *Hewitt*, 459 U.S. at 468; *see also Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("The Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement"). Indeed, the Due Process Clause does not protect against all changes in conditions of confinement even where they "hav[e] a substantial adverse impact on the prisoner involved." *Meachum v. Fano*, 427 U.S. 215, 224 (1976).

Based on these principles, "[o]nly the most extreme changes in the conditions of confinement," like an involuntary commitment to a mental institution, or the forced administration of psychotropic drugs, have been held to directly invoke the protections of the Due Process Clause. *See Chappell v. Mandeville*, 706 F.3d 1052, 1063 (9th Cir. 2013) (citing *Vitek v. Jones*, 445 U.S. 480, 493–94 (1980); *Washington v. Harper*, 494 U.S. 210, 221–22 (1990)). A "temporary contraband watch does not rise to this level." *Chappell*, 706 F.3d at 1063 (holding that a California prisoner placed on contraband watch for six days could not claim a liberty interest under the Due Process Clause of the Fourteenth Amendment); *see also Davis v. Andrade*, 2019 WL 4879102, at *3 (E.D. Cal. Oct. 3, 2019) (finding prisoner placed on contraband watch after a body scan failed to state a "cognizable due process claim" sufficient to survive initial screening pursuant to 28 U.S.C. § 1915A). Here, Reynolds was placed on CSW for only two days. Under *Chappell*, the Court does not find that Reynolds's allegations invoke a constitutional liberty interest arising from the Due Process Clause of the Fourteenth Amendment.

### ii. Liberty Interests Arising from State Law

"States may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Sandin v. Conner*, 515 U.S. 472, 483–84 (1995). "[T]hese

interests will be generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484; *see Wilkinson*, 545 U.S. at 223 ("After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" (quoting *Sandin*, 515 U.S. at 484)).

"There is no single standard for determining whether a prison hardship is atypical and significant." *Chappell*, 706 F.3d at 1064. Even deprivations that are "concededly punitive" are not sufficient by themselves. *Sandin*, 515 U.S. at 485. Instead, the analysis is "context dependent" and "requires 'case by case, fact by fact consideration.'" *Chappell*, 706 F.3d at 1064 (quoting *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996); *Ramirez v. Galaza,* 334 F.3d 850, 861 (9th Cir. 2003)). In making this determination, courts are guided by *Sandin* to inquire: "1) whether the challenged condition mirrored those conditions imposed upon inmates in administrative segregation and protective custody, and thus comported with the prison's discretionary authority; 2) the duration of the condition, and the degree of restraint imposed; and 3) whether the state's action will invariably affect the duration of the prisoner's sentence." *Ramirez*, 334 F.3d at 861 (quoting *Sandin*, 515 U.S. at 486–87). In sum, to invoke a state-created liberty interest, the nature of the prisoner's hardship must be alleged to "present a dramatic departure from the basic conditions of [his] . . . sentence." *Id.*

Courts in this district have held that a temporary placement in CSW up to three days pursuant to California law is not enough to trigger a hardship that is "atypical and significant." *See Meraz v. Reppond,* 2009 WL 723841, at *2 (N.D. Cal. Mar. 18, 2009) (dismissing a due process claim in a § 1915A screening order where the inmate alleged that he was placed in a contraband watch cell for three days because such placement did not constitute an atypical and significant hardship); *see also Price v. Sutton*, 2020 WL 4922502, at *5 (E.D. Cal. Aug. 21, 2020) (dismissing a due process claim in a § 1915A

- 14 -

screening order where the inmate alleged that he was placed in a temporary contraband watch cell).  *But cf. Romo v. Cate*, No. 2:11-CV-2898 DAD P, 2014 WL 4276071, at *12 (E.D. Cal. Aug. 29, 2014) (finding that it would not be implausible for the alleged eight-day placement in CSW to constitute an atypical and significant hardship, given the related finding that "the operative complaint contain[ed] a plausible basis for an Eighth Amendment claim"), *adopted as modified*, No. 2:11-CV-2898 GEB DAD, 2014 WL 4929461 (E.D. Cal. Sept. 30, 2014).  Here, Reynolds alleges that he was placed in CSW for two days.  As will be discussed in detail below, the Court does not find that his Complaint plausibly states a violation of the Eighth Amendment.  *See infra* Part II.C.2.c. Therefore, the Complaint does not plausibly state that Reynolds endured an atypical and significant punishment by being placed in CSW, and the Court finds no constitutional liberty interest arising from California law.

### c.   The Eighth Amendment

Reynolds also claims that his CSW placement constituted "cruel and unusual punishment." (*See* Compl. at 15.)  Specifically, Reynolds challenges the conditions of his isolation, in "limited apparel [and] in restraints," which deprived him of sleep and caused him to suffer "muscle aches" throughout the two days he was confined there.  (*Id.*)  The Eighth Amendment prohibits the imposition of cruel and unusual punishments and "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity and decency.'" *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation omitted).  In order to state an Eighth Amendment claim however, Reynolds must satisfy both the objective and subjective components of a two-part test.  *See Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991); *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002).  First, he must allege that Defendants deprived him of the "minimal civilized measure of life's necessities." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (quoting *Wilson*, 501 U.S. at 304).  When determining whether an alleged deprivation is objectively serious enough to support an Eighth Amendment claim, the court must consider the circumstances, nature, and duration

of the deprivation. *Johnson v. Lewis*, 217 F.3d 726, 731–32 (9th Cir. 2000). Second, Reynolds must allege facts sufficient to plausibly show that each Defendant he seeks to hold liable had a "sufficiently culpable mind." *Wilson*, 501 U.S. at 297. "In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted). That is, that the official must "kn[ow] of and disregard[] an excessive risk to inmate health or safety[.]" *Id.* at 837.

District courts considering Eighth Amendment challenges to CSW placements and other contraband surveillance conditions have consistently found no Eighth Amendment violations—either because the deprivations were not "sufficiently serious," or because of the lack of allegations that the defendant officials acted with deliberate indifference. *See*, *e.g., Centeno v. Wilson*, 2011 WL 836747, at *3 (E.D. Cal. Mar. 4, 2011) (finding no Eighth Amendment violation when prisoner was placed on contraband watch and forced to sleep on a cold floor without a mattress, blanket, or the ability to shower for seven days), *aff'd*, 479 F. App'x 101 (9th Cir. 2012); *Diaz v. Cate*, 2013 WL 4479262, at *3–4 (N.D. Cal. Aug. 20, 2013) (ruling that a five-day confinement in a dry cell with a portable toilet and buckets for defecating did not violate the Eighth Amendment, even though the plaintiff was restrained, not allowed to shower, and was forced to eat and sleep on the floor without a blanket); *Frye*, 2012 WL 951318, at *1, 6 (finding no Eighth Amendment violation where the prisoner was confined nearly naked in a dirty cell for two days with no toilet access but only a bucket to relieve himself, constant lighting, and no toilet paper or soap and water); *Hefa v. Hanratty*, 2021 WL 965451, at *1 (W.D. Wash. Jan. 13, 2021) (dismissing Eighth Amendment challenge to "dry cell" contraband confinement conditions where prisoner was strip-searched, required to provide a urine sample, forced to wear a full body suit with his ankles and wrists zip-tied and taped, and held in a holding cell with no toilet or sink under surveillance for "84 hours or 3 normal bowel movements, whichever occurred first"), *adopted*, 2021 WL 963480 (W.D. Wash. Mar. 15, 2021). *But cf. Harris v. Lappin*, 2009 WL 789756, at *10 (C.D. Cal. Mar. 19, 2009) (finding a viable Eighth Amendment claim

for 11-day dry cell confinement in filthy floor covered with other inmates' waste and bodily fluids).

Here, Reynolds alleges that during his CSW placement, he was sent to a steel cage and was made to wear two white jumpsuits while secured in handcuffs, a waist chain, and leg restraints. (Compl. at 9.) After being made to go through the "Adani Low-Dose Body Scanner" twice, Reynolds alleges he was placed in Ad-Seg, inside a single steel cage, then sent to a cold isolation cell with only an iron bench with bright light. (*Id.* at 10–11.) When Reynolds had to defecate, the officers made him wear nothing but his boxer shorts and socks, required him to use the portable toilet under observation, and inspected his excrement for contraband. (*Id.* at 11–13.) At night the officers "tossed a mattress" on the floor of the isolation cell, and Reynolds could not sleep because his lower back, arms, wrists, and legs were irritated by the restraints. (*Id.* at 12.)

As pleaded, the Court finds that Reynolds's CSW conditions claims, while unpleasant and humiliating, are less onerous and shorter in duration that those endured by the prisoners in *Chappell*, *Centeno*, *Diaz*, *Frye* and *Hefa.* As such, Reynolds's allegations are not enough to meet the objective requirements of an Eighth Amendment claim. *See Frost*, 152 F.3d at 1128; *Wilson*, 501 U.S. at 304; *Meraz*, 2009 WL 723841, at *2 (*sua sponte* dismissing pursuant to 28 U.S.C. § 1915A allegations of prisoner who was held in a "small holding cell wearing only boxer shorts," "observed at all times," and who "had his excrement inspected for contraband" for a period of three days were "not sufficiently serious enough" to meet the Eighth Amendment's objective pleading requirements). Moreover, Reynolds fails to allege that any of Defendants he identifies as having participated in his CSW placement (Din, Buttler, Loshek, or Layvas) acted with deliberate indifference to a serious risk of harm to either his health or his safety. *See Farmer*, 511 U.S. at 834; *see also Price v. Sutton*, 2020 WL 4922502, at *5 (E.D. Cal. Aug. 21, 2020) (finding prisoner's allegations of having been "subjected to a contraband watch under unsanitary conditions" and in the presence of a female guard subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A because "[w]hile being subjected to a

contraband search may be considered a serious deprivation in itself, Plaintiff [did] not alleged facts showing that any of the Defendants had a sufficiently culpable state of mind for an Eighth Amendment violation.").

In sum, the Court concludes that Reynolds's allegations about his placement in the CSW do not state a plausible claim for a violation of the Eighth Amendment.

### 3.    RVRs & Inmate Appeals Claims—"Count 2"

With respect to his claims in Count 2—specifically, that Defendants Loshek, Barba, Torres, Preciado, and Hernandez "filed false RVRs" against him; that an unidentified ISU Lieutenant "forged [his] name on a mandatory drug testing list"; that Defendants Perez, Sanchez, Zamora, Ruiz, and Bonillas "knowingly held blind disciplinary hearings," and rendered "arbitrary guilty findings;" that Defendants Johnson and Salcido "knowingly affirm[ed] [these] illegal disciplinary hearing actions"; and that Defendants Santana, Garcia, and Juarez "intentionally failed to correct officers['] infringements" in response to Reynolds's multiple inmate grievances and appeals, (*see* Compl. at 20; *supra* Part II.B.2)— the Court finds that Reynolds has failed to allege any plausible violation of his Fourth, Eighth, or Fourteenth Amendment rights.

### a.    The Fourth Amendment

While Reynolds mentions the Fourth Amendment in his Count 2 claims, none of the factual allegations he makes against any of these Defendants plausibly suggests or would support any Fourth Amendment violation. *See Hudson,* 468 U.S. at 525 ("The applicability of the Fourth Amendment turns on whether 'the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action.") (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).  Thus, the Court dismisses any Fourth Amendment claims raised as a part of Count 2.

//
//

### b.    The Fourteenth Amendment

Reynolds has no Fourteenth Amendment liberty interest in not being falsely accused of prison rules violations.  *See Rios v. Paramo*, 2016 WL 8731085, at *35 (S.D. Cal. July 15, 2016), *adopted*, 2016 WL 4709063 (S.D. Cal. Sept. 9, 2016); *see also Solomon v. Meyer*, 2014 WL 294576, at *2 (N.D. Cal. Jan. 27, 2014); *Johnson v. Felker*, 2013 WL 6243280, at *6 (E.D. Cal. Dec. 3, 2013) ("Prisoners have no constitutionally guaranteed right to be free from false accusations of misconduct, so the mere falsification of a [rules violation] report does not give rise to a claim under section 1983.").  Thus, insofar as Reynolds claims that Defendants Loshek, Barba, Torres, Preciado, and Hernandez "filed false RVRs"[7] accusing him of refusing to submit urine samples in violation of California Department of Corrections rules,[8] or that Defendant ISI Lt. Doe "forged" his name on a mandatory urine testing list after he was found guilty of refusing to provide a UA sample "for probable cause due to his being placed on [CSW]" on May 30, 2019, as a result of his disciplinary conviction pursuant to RVR Log No. 6857810,[9] he fails to state a plausible claim for relief.[10]

---

[7] The following appears to be the relevant RVRs: Pl.'s Ex. BB (RVR Log No. 6857810), ECF No. 4-3 at 8–21; Ex. BC (RVR Log. No. 6890922), ECF No. 4-3 at 22–35; Ex. BD (RVR Log No. 6953012), ECF No. 4-3 at 36–49; Ex. BE (RVR Log No. 6972817), ECF No. 4-3 at 50–63; Ex. BG (RVR No. 7012801), ECF No. 4-3 at 81–95).

[8] "Inmates who refuse or are unable to provide a urine sample shall be subject to disciplinary action in accordance with [Cal. Code Regs., tit. 15 §] 3323(h)(5)."  Cal. Dept. of Corr. & Rehab., Operations Manual ("DOM"), § 52010.20; *see also* Pl.'s Ex. AG, ECF No. 4-2 at 27.

[9] *See* Pl.'s Ex. BB, ECF No. 4-3 at 9, 18.

[10] The Court also notes that, according to Reynolds's own exhibit, Reynolds's Disciplinary Hearing Disposition Results in RVR Log No. 6857810, dated June 29, 2019, include as part of his sanction a referral to a Unit Classification Committee ("UCC") for substance abuse treatment, and an order "to provide a mandatory random drug test [MRDT] within the next 90 day period."  (*See* Pl.'s Ex. BB, ECF No. 4-3 at 18.)  The same exhibit memorializes that the Senior Hearing Officer "advised [Reynolds] [that] a refusal to submit to ur[i]nalysis will result in an additional Rules Violation."  (*Id.*)

Another exhibit submitted by Reynolds shows that under the relevant California rule, "[i]nmates found guilty of a rule violation related to the use, possession, sale, distribution,

### c.   The Eighth Amendment

Reynolds's Eighth Amendment claims challenging the allegedly false RVRs and the attendant disciplinary hearings, convictions, and sanctions fare no better.  (*See* Compl. at 20.)  "After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quotation omitted).  The Eighth Amendment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement.  *See Farmer*, 511 U.S. at 832; *see also Rhodes v. Chapman* ("*Rhodes I*"), 452 U.S. 337, 347 (1981).  Prison officials must ensure prisoners are not deprived of adequate shelter, food, clothing, sanitation, medical care, or personal safety, *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) (quotation marks and citations omitted), but "not every injury that a prisoner sustains while in prison represents a constitutional violation."  *See Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006).  Instead, a prisoner claiming an Eighth Amendment violation must allege sufficient facts to plausibly state: (1) the deprivation he suffered was "objectively, sufficiently serious;" and (2) that prison officials acted with deliberate indifference to a serious risk to his health or safety in allowing that deprivation to take place.  *Farmer*, 511 U.S. at 834; *Thomas v. Ponder*, 611 F.3d 1144, 1150–51 (9th Cir. 2010).

Nothing in Reynolds's Complaint, Declaration, or exhibits plausibly suggest that any Defendant's actions constituted "objectively, sufficiently serious" deprivations under the Eighth Amendment.  *Farmer*, 511 U.S. at 834.  Post-conviction "[c]onditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment."  *Rhodes I*, 452 U.S. at 347.  But to "the extent that . . . [the] conditions are [merely] restrictive [or] even harsh,

---

or introduction of controlled substances, drugs, or drug paraphernalia; *or refusal to submit to a test for controlled substances or drugs* [would] be placed on the institution's MRDT list." Cal. Dept. of Corr. & Rehab., Operations Manual ("DOM"), § 52010.20 (emphasis added).  (*See* Pl.'s Ex. AM, ECF No. 4-2 at 37.)

they are part of the penalty that criminal offenders pay for their offenses against society," and do not offend Eighth Amendment principals. *Id.* "[O]nly minimal life necessities" like food, clothing, shelter, medical care, and safety are protected by the Eighth Amendment. *Puckett v. Houston*, 2017 WL 2619121, at *3 (E.D. Cal. June 16, 2017). A prison official's decision to charge an inmate with disciplinary violations based on his refusal to submit to urinalysis testing as authorized by Cal. Code Regs., tit. 15 § 3323(h)(5)[11] simply does not involve nor deprive him of a constitutionally protected basic human need and thus does not rise to the level of cruel and unusual punishment. *See, e.g., Collins v. Williams*, 536 F. App'x 706, 707 (9th Cir. 2013) (finding that "neither the issuance of disciplinary charges of which Collins was later acquitted—nor his placement in administrative, protective, and disciplinary segregation for almost six months— constituted cruel and unusual punishment).

Nor has Reynolds alleged facts sufficient to plausibly state that any Defendant "kn[ew] of and disregard[ed] an excessive risk to [his] health or safety" either by issuing RVRs which charged him with refusing to provide urine samples, or by finding him guilty as a result of his refusals. *See Farmer*, 511 U.S. at 837; *see also Ivy v. Wingo*, 2020 WL 5709278, at *8 (S.D. Cal. Sept. 24, 2020) (*sua sponte* dismissing prisoner's conclusory challenge to disciplinary conviction as "cruel and unusual punishment" pursuant to 28 U.S.C. §§ 1915(e)(2) & 1915A).

Reynolds also fails to state any plausible claim for relief against Defendants Santana, Garcia, or Juarez—who are all inmate appeals officials that responded to at least ten CDCR 602 Inmate Appeals and grievances Reynolds filed in response to each RVR filed against him after he refused to submit urine samples on May 31, 2019, August 15, 2019, January

---

[11] Cal. Code Regs., tit. 15 § 3323(h)(5) sanctions a 0–30 day "credit forfeiture" for a "Division F Offense" based on an inmate's "[r]efus[al] to provide a urine specimen for the purpose of testing for the presence of controlled substance(s) or alcohol."

7, 2020, February 20, 2020, and July 3, 2020,[12] and after he was approved for transfer during his UCC Annual Review Hearing on April 2, 2020.[13]  Specifically, Reynolds faults these inmate grievance and appeals officials for "failing to forward" his many appeals to "the hiring authority for review," for failing to return his appeals, for "intentionally extend[ing] the due date[s]," and for "intentionally fail[ing] to correct officers infringements."  (*See* Compl. at 16–20.)

But simply "[r]uling against a prisoner on an administrative complaint does not cause or contribute to the violation." *Ellington v. Clark*, 2010 WL 3001427, at *2 (E.D. Cal. Jul. 29, 2010) (quoting *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007)).  A prison official's allegedly improper processing of grievances or appeals, without more, does not provide an independent basis for a constitutional violation. *See Ramirez*, 334 F.3d at 860 (prisoners do not have a "separate constitutional entitlement to a specific prison grievance procedure.") (citation omitted); *Thomas v. Matevousian*, 2018 WL 1452261 at *4 (E.D. Cal. Mar. 21, 2018) ("Actions in reviewing a prisoner's administrative appeal generally cannot serve as the basis for liability in a section 1983 action."); *Phillipi v. Patterson*, 2014 WL 11774836 at *3 (E.D. Cal. Aug. 1, 2014) ("[D]enial of an inmate appeal . . . does not state a cognizable constitutional violation"), *aff'd*, 599 F. App'x 288 (9th Cir. 2015); *Davis v. Penzone*, 2017 WL 8792541, at *5 (D. Ariz. July 25, 2017) (prison administrators and other supervisors are not per se liable for an alleged violation of a prisoner's federal constitutional rights simply by failing to grant his "grievances or grievance appeals").

---

[12] *See* Compl. at 16–19 & Ex. BI, ECF No. 4-3 at 98-110 (CDCR 602 Log No. 19-1297); Ex. BM, ECF No. 4-3 at 117–132 (CDCR 602 Log No. 19-1418); Ex. BP, ECF No. 4-3 at 138–157 (CDCR 602 Log. No. 19-1875); Ex. BZ, ECF No. 4-3 at 180–190 (CDCR 602 Log No. 20-0332); Ex. CA, ECF No. 4-4 at 2–19 (CDCR 602 Log. No. 20-0618); Ex. CF, ECF No. 4-4 at 50–58 (CDCR 602 Log No. 5277); Ex. CM, ECF No. 4-4 at 77–83; Ex. CO, ECF No. 4-4 at 90–97 & Ex. CS, ECF No. 4-4 at 110–116 (CDCR 602 Log No. 23290); Ex. CR, ECF No. 4-4 at 104–109 & Ex. CU, ECF No. 4-4 at 118–123 (CDCR 602 Log No. 33421).

[13] *See* Ex. CD, ECF No. 4-4 at 27–42 (CDCR 602 Log. No. 20-0765); Ex. CI, ECF No. 4-4 at 64–69 & CN, ECF No. 4-4 at 84–89 (CDCR 602 Log No. 14631).

Because Reynolds alleges that Defendants Santana, Garcia, and Juarez's only involvement was their failure to intervene or correct the other Defendants' alleged violations of his rights under the Fourth, Fourteenth, and Eighth Amendments, he fails to state a claim against those Defendants. *See* 28 U.S.C. §§ 1915(e)(2), 1915A(b); *Iqbal*, 556 U.S. at 677 ("Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."); *Ivy*, 2020 WL 5709278, at *7 (dismissing prisoner's claims against appeals officials alleged to have "failed to correct" other official's "errors" via CDCR 602 inmate appeal procedures pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A); *Moreno v. Ryan*, 2017 WL 2214703, at *3 (D. Ariz. May 19, 2017) (holding that the official's failure to intervene on the prisoner's behalf to remedy the alleged violation of the prisoner's constitutional right did not by itself amount to an independent or freestanding constitutional violation for purposes of § 1983).

### 4.   Retaliatory Transfer Claims—"Count 2"

Finally, Reynolds contends that Defendants McClain, Galindo, Hernandez or Fernandez,[14] and Moreno "worked in union for [a] retaliatory transfer." (*See* Compl. at 20.) Reynolds makes few factual allegations with respect to this claim in his Complaint, but in his Declaration, he claims UCC Chairperson McClain "made an unconstitutional decision" during his April 2, 2020 annual classification hearing by referring him to a "CSR Committee Staff Representative for pending transfer to Salinas Valley State Prison ("SVSP") under retaliatory means due to cause for action and appeals filed." (*See* Compl. at 18; Pl.'s Decl., ECF No. 5 at 24.)

---

[14] Reynolds also alleges either Correctional Officer A. Hernandez *or* A. Fernandez "worked in union" with McClain, Galindo, and Moreno by "vicariously attempt[ing] to move [him] to Facility B Yard" on May 16, 2020. (*See* Compl. at 18, 20; *cf.* Pl.'s Decl., ECF No. 5 at 25–26.) But he does not further explain what this had to do with his April 2, 2020 UCC hearing, his approval for transfer to SVSP. He does not explain how moving him to Facility B Yard was adverse, related to any protected conduct, or constituted a failure to advance a legitimate correctional goal. *See Rhodes II*, 408 F.3d at 567.

Reynolds also refers to several exhibits in support of this claim: (1) a Notice of Classification Hearing issued by Galindo on April 1, 2020, informing him that his case would be "reviewed for possible involuntary and non-adverse transfer to an alternate Level IV (270) Institution," an April 2, 2020 Classification Committee record identifying McClain as UCC Chair and Galindo as Recorder, and an April 7, 2020 Auditor Action endorsed by CSR Moreno, *see* Pl.'s Ex. BF, ECF No. 4-3 at 65–70; (2) a CDCR 22 Inmate Parolee Request dated April 5, 2020, *see* Ex. CB, ECF No. 4-4 at 21; and (3) his CDCR 602 Log No. 20-0765, dated April 16, 2020, including both First and Second Level Appeal Responses. (*See* Ex. CD, ECF No. 4-4 at 27–42.) These exhibits, which Reynolds incorporates by reference in his Complaint and his Declaration,[15] reveal that he appeared on April 2, 2020, before McClain and Galindo for a "FAC C UCC" Annual Review hearing pursuant to Cal. Code Regs., tit. 15 § 3375(e)(f)(1), and March 27, 2020 Memorandum governing the conversion of Centinela State Prison Facility B Level IV General Population Yard to a Level III General Population Yard.[16] (*See* Ex. CD, ECF No. 4-4 at 37–38.) At this UCC hearing, Reynolds's custody level classification score was "increased from 93 to 105 points based on his work and disciplinary history from 04/12/19 to 4/11/20," including four of the RVRs issued against him. According to the UCC record, Reynolds's new custody classification score was "consistent with Level IV Placement," and he was determined to "meet the criteria for transfer" to SVSP "due to the . . . conversion of CEN

---

[15] *See* Compl. at 18; Pl.'s Decl., ECF No. 5 at 24–26, 29, 30.

[16] Reynolds's UCC record, as well as the Institutional Level Inmate Appeal Response to CDCR 602 Log No. 20-0765, in which Reynolds challenged the UCC's April 2, 2020 findings and transfer endorsement, both state that the "conversion [of CEN's Facility B] from a Level IV (270) General Population (GP) Facility to a Level III GP Facility," was "in the process" and designed to "assist the . . . CDCR in increasing the number of Level III GP beds, which w[ould] in turn reduce the current Level III GP overcrowding percentages," "allow for increased Reception Center (RC) inmate movement," "mitigate potential backlogs in the RC, which impede CDCR's ability to accommodate weekly county intake," and "assist in efforts to operate within Level III desired crowding standard as outlined in the Future of California Corrections Blueprint." (*See* Ex. BF, ECF No. 4-3 at 67; Ex. CD, ECF No. 4-4 at 38.)

Facility B."  (*See* Pl.'s Ex. BF, ECF No. 4-3 at 67.)

Prisoners have no constitutional right to incarceration in a particular institution.  *See Olim v. Wakinekona*, 461 U.S. 238, 244–48 (1983) ("Even when, as here, the [prison] transfer involves long distances and an ocean crossing [from Hawaii to California], the confinement remains within constitutional limits."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976).  A prisoner's liberty interests are sufficiently extinguished by his conviction that the state may generally confine or transfer him to any of its institutions, to prisons in another state, privately-run facilities or to federal prisons, without offending the Constitution.  *See Rizzo v. Dawson*, 778 F.2d 527, 530 (9th Cir. 1985) (holding that intrastate prison transfer does not implicate Due Process Clause).

However, "[p]risoners [do] have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so."  *Watison*, 668 F.3d at 1114 (citing *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009)).  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  *Rhodes v. Robinson* ("*Rhodes II*"), 408 F.3d 559, 567–68 (9th Cir. 2005).

As pleaded, Reynolds adequately alleges that he filed multiple inmate grievances related to his CSW and subsequent RVRs.  *See Watison*, 668 F.3d at 1114 (holding that the filing of an administrative appeal is conduct protected by the First Amendment).  He further identifies Defendants McClain, Galindo, and Moreno, as "responsible" for the April 2, 2020 classification determination and endorsement for his transfer to SVSP,[17] which is sufficient to plead an "adverse" action.  *See also Rhodes II*, 408 F.3d at 568 (holding that prison transfer may constitute an adverse action).

---

[17] *See* Compl. at 5.

However, while the timing of an allegedly adverse action "can properly be considered as circumstantial evidence of retaliatory intent," *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995), Reynolds nevertheless fails to provide any "further factual enhancement" to suggest McClain, Galindo, or Moreno found him eligible for transfer to SVSP because he filed CDCR 602 inmate appeals against any of the other Defendants responsible for his CSW placement or for any of his previous RVR proceedings. *Bell Atlantic v. Twombly*, 550 U.S. 554, 557 (2007); *Brodheim*, 584 F.3d at 1271 (plaintiff must plead enough facts to plausibly establish defendants' "retaliatory motive"); *Rhodes II*, 408 F.3d at 567; *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) (holding that the plaintiff was required to allege that his protected conduct was "the 'substantial' or 'motivating' factor behind the defendant's conduct"). Reynolds concludes only that McClain, Galindo, Hernandez (or Fernandez) "worked in union for retaliatory transfer," and concocted a "stratagem" to "falsely us[e] B yard conversion" to justify his transfer "due to cause for action and appeals filed." (*See* Compl. at 20; Pl.'s Decl., ECF No. 5 at 24.) But conclusory allegations alone are not enough to plead retaliatory motive. Speculation is insufficient, *see Bell Atlantic*, 550 U.S. at 555, and in reviewing retaliation claims, courts have cautioned against "engag[ing] in the logical fallacy of post hoc, ergo propter hoc, literally, 'after this, therefore because of this.'" *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (citation omitted).

Further, Reynolds does not allege any facts to plausibly suggest that McClain, Galindo, or Moreno's actions chilled the exercise of any protected conduct. *Brodheim*, 584 F.3d at 1269, 1271 (adverse action must be sufficient to "chill or silence a person of ordinary firmness from future First Amendment activities") (citing *Rhodes II*, 408 F.3d at 568-69). Lastly, Reynolds fails to plead any facts to suggest that McClain, Galindo, or Moreno's transfer endorsement failed to "reasonably advance a legitimate correctional goal." *Id.* at 1269; *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995) ("[Plaintiff] must show that there were no legitimate correctional purposes motivating the actions he complains of."). "A plaintiff successfully pleads this element by alleging, in addition to a

retaliatory motive, that the defendant's actions were arbitrary and capricious, or that they were 'unnecessary to the maintenance of order in the institution.'" *Watison*, 668 F.3d at 1114–15 (quoting *Franklin v. Murphy*, 745 F.2d 1221, 1230 (9th Cir. 1984)).

Thus, for all these reasons, the Court finds that Reynolds's does not state a plausible First Amendment retaliation claim related to his April 2, 2020 UCC hearing or its results. *See Lopez*, 203 F.3d at 1126-27; *Rhodes III*, 621 F.3d at 1004.

### D.     Leave to Amend

Having found that Reynolds's Complaint, when considered together with his Declaration, and all incorporated exhibits, does not state any § 1983 claim upon which relief can be granted, the Court dismisses the Complaint *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and § 1915A(b)(1). *See Watison*, 668 F.3d at 1112; *Wilhelm*, 680 F.3d at 1121. In light of Reynolds's pro se status, the Court also grants Reynolds leave to amend. *See Rosati v. Igbinoso*, 791 F.3d 1037, 1039 (9th Cir. 2015) ("A district court should not dismiss a pro se complaint without leave to amend [pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii)] unless 'it is absolutely clear that the deficiencies of the complaint could not be cured by amendment.'") (quoting *Akhtar*, 698 F.3d at 1212).

## III.    CONCLUSION AND ORDER

Accordingly, the Court:

1.      **GRANTS** Reynolds's Motion to Proceed IFP pursuant to 28 U.S.C. § 1915(a) (ECF No. 2).

2.      **DIRECTS** the Secretary of the CDCR, or her designee, to collect from Reynolds's trust account the $350 filing fee owed in this case by garnishing monthly payments in an amount equal to twenty percent (20%) of the preceding month's income and forwarding those payments to the Clerk of the Court each time the amount in the account exceeds $10 pursuant to 28 U.S.C. § 1915(b)(2). ALL PAYMENTS MUST BE CLEARLY IDENTIFIED BY THE NAME AND NUMBER ASSIGNED TO THIS

ACTION.

    3.    **DIRECTS** the Clerk of the Court to serve a copy of this Order by U.S. Mail on Kathleen Allison, Secretary, CDCR, P.O. Box 942883, Sacramento, California, 94283-0001, or by forwarding an electronic copy to trusthelpdesk@cdcr.ca.gov.

    4.    **DISMISSES** Reynolds's Complaint *sua sponte* and in its entirety based on his failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

    5.    **GRANTS** Reynolds 60 days leave from the date of this Order in which to file an Amended Complaint which cures the deficiencies of pleading noted.  Should Reynolds seek to amend his Complaint he must file the Amended Complaint or **on or before November 24, 2021**.

    Reynolds's Amended Complaint must be complete by itself without reference to his original pleading.[18]  Defendants not named and any claim not re-alleged in his Amended Complaint will be considered waived.  *See* S.D. Cal. Civ. L.R. 15.1; *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1989) ("[A]n amended pleading supersedes the original."); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012) (noting that claims dismissed with leave to amend which are not re-alleged in an amended pleading may be "considered waived if not repled").

    If Reynolds fails to file an Amended Complaint within 60 days of the date of this Order, or **on or before November 24, 2021**, the Court will enter a final Order dismissing this civil action based both on his failure to state a claim upon which relief can be granted pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A(b) and his failure to prosecute in

---

[18] Because the exhibits Reynolds filed in support of his original Complaint are voluminous, he need not re-file them together with his Amended Complaint and may instead simply request that the exhibits already on file, *see* ECF Nos. 4, 4-1, 4-2, 4-3, and 4-4, be incorporated by reference in his Amended Complaint.  *See* S.D. Cal. Civ. L.R. 15.1 (requiring that "[a]ll amended pleadings must contain copies all exhibits referred to in such amended pleadings[,]" unless permission is granted by the Court to remove and attach exhibits from a prior pleading to the amended pleading).

21cv955

compliance with a court order requiring amendment. *See Lira v. Herrera*, 427 F.3d 1164, 1169 (9th Cir. 2005) ("If a plaintiff does not take advantage of the opportunity to fix his complaint, a district court may convert the dismissal of the complaint into dismissal of the entire action.").

**IT IS SO ORDERED.**

**DATED: September 29, 2021**

Hon. Cynthia Bashant
United States District Judge