UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HAISANI REYNOLDS,<br>CDCR #AN-9755,<br><br>                              Plaintiff,<br><br>vs.<br><br>RAYMOND MADDEN, *et al*.,<br><br>                              Defendants. | Case No.:  21-cv-00955-BAS-RBB<br><br>**ORDER DISMISSING CIVIL ACTION FOR FAILING TO STATE A CLAIM PURSUANT TO 28 U.S.C. § 1915(e)(2)(B) AND 28 U.S.C. § 1915A(b)(1)**<br><br>**[ECF No. 7]** |

Plaintiff Haisani Reynolds, incarcerated at Centinela State Prison ("CEN"), is proceeding pro se and *in forma pauperis* ("IFP") in this civil rights action pursuant to 42 U.S.C. § 1983.

## I.    PROCEDURAL BACKGROUND

Reynold's original Complaint alleged that almost three dozen CEN correctional, inmate appeal, disciplinary, and classification officials violated his First, Fourth, Eighth, and Fourteenth Amendment rights after he refused to "strip out" while a cell search was conducted in his housing unit on May 30, 2019.  Reynolds further alleged that he was patted down, subjected to metal detection, segregated during a two-day contraband

surveillance watch ("CSW"), charged with a "false" serious rules violation ("RVR") for failing to provide a urine sample, and then placed on a mandatory drug testing list. (*See* Ex. BB, ECF No. 4-3 at 9.) Multiple officers issued RVRs to Reynolds because he refused to submit to urinalysis testing, and he suffered several disciplinary convictions as a result. (*See* Compl. at 1, 7, 14–15, 16–20; *see also* Pl.'s Decl. in Supp. of Compl. (ECF No. 5).) Reynolds filed a series of inmate appeals in response to each RVR, and was later authorized for transfer to another prison, which he alleged was retaliatory. (*See* Compl. at 20.) Reynolds sought declaratory and injunctive relief, including his removal from the mandatory drug testing list, the restoration of custody credits and privileges forfeited due to his disciplinary convictions, and general and punitive damages. (*See* Compl. at 1, 23.)

On September 29, 2021, the Court granted Reynolds leave to proceed IFP, reviewed his Complaint, Declaration, and more than 600 pages of exhibits he incorporated by reference, and dismissed his Complaint *sua sponte* for failing to state a claim upon which § 1983 relief could be granted pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A(b). (*See* ECF No. 6.) Specifically, the Court (1) dismissed Reynolds' claims against Defendants Madden and Vasquez on respondeat superior grounds, *id.* at 9–10; (2) dismissed Reynolds' Fourth, Eighth, and Fourteenth Amendment claims against Defendants Sais, Rodriguez, Lam, Verdugo, Loop, Loshek, Carillo, Layvas, Buttler and two unidentified Does related to Reynolds' strip search and CSW placement as alleged in Count 1; *see id.* at 10–18; and (3) dismissed all Reynolds' First, Fourth, Eighth, and Fourteenth Amendment claims related to his subsequent disciplinary hearings, inmate appeals, and transfer authorization involving Defendants Loshek, Barba, Torres, Preciado, Hernandez, Perez, Sanchez, Zamora, Ruiz, Bonillas, Johnson, Salcido, Santana, Garcia, Juarez, McClain, Galindo, Fernandez, and Moreno as alleged in Count 2. (*Id.* at 18–27.) The Court then granted Reynolds leave to amend his pleading deficiencies and relieved him of his duty to reattach all exhibits previously submitted, but cautioned that should he fail to sufficiently amend, his case would be dismissed. (*See id.* at 27–29.)

Reynolds has since submitted an Amended Complaint renaming a majority of the Defendants, and adding several others. (*See* ECF No. 7, "Am. Compl." at 1–4.) He has also filed a second Declaration in Support of his Amended Complaint, (*see* ECF No. 7-1, "Decl."), supplemented by five additional exhibits (ECF No. 7-3). Reynolds' Amended Complaint realleges his strip search, contraband watch, rules violations, and inmate appeals claims, but it is now divided into three "Counts," each asserting violations of the First, Fourth, Eighth, and/or Fourteenth Amendments. (*See* Am. Compl. at 1, 5–10, ¶¶ 13–52 ("Count 1"), 11–16, ¶¶ 53–78 ("Count 2"), 17–20, ¶¶ 79–92 ("Count 3").)

The Court now screens Reynolds' Amended Complaint to determine whether he has alleged plausible claims for relief under the First, Fourth, Eighth, or Fourteenth Amendments pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A.[1]

## II.   SCREENING

### A.   Standard of Review

The Prison Litigation Reform Act ("PLRA") requires this Court to review complaints filed by all persons proceeding IFP and by those, who are "incarcerated or detained in any facility [and] accused of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms or conditions of parole, probation, pretrial release, or diversionary program," at the time of filing "as soon as practicable after docketing." *See* 28 U.S.C. §§ 1915(e)(2) and 1915A(b). Under these statutes, the Court must *sua sponte*

---

[1] Reynolds's Amended Complaint does *not* reallege any retaliation claims related to his April 2, 2020 Unit Classification Hearing and transfer authorization. (*See* ECF No. 6 at 23–27.) As such, the retaliatory transfer claims he previously alleged against Defendants McClain, Galindo, Hernandez or Fernandez, and Moreno are waived. (*See id.* at 28, citing S.D. Cal. CivLR 15.1; *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1546 (9th Cir. 1989) ("[A]n amended pleading supersedes the original."); *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012) (noting that claims dismissed with leave to amend which are not re-alleged in an amended pleading may be "considered waived if not repled.").)

dismiss complaints or any portions thereof, which are frivolous, malicious, fail to state a claim, or which seek damages from defendants who are immune. *See* 28 U.S.C. §§ 1915(e)(2)(B) and 1915A; *Lopez v. Smith*, 203 F.3d 1122, 1126-27 (9th Cir. 2000) (en banc) (citing § 1915(e)(2)); *Rhodes v. Robinson ("Rhodes I")*, 621 F.3d 1002, 1004 (9th Cir. 2010) (discussing 28 U.S.C. § 1915A(b)).

"The purpose of § 1915A is 'to ensure that the targets of frivolous or malicious suits need not bear the expense of responding.'" *Nordstrom v. Ryan*, 762 F.3d 903, 920 n.1 (9th Cir. 2014) (quoting *Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 681 (7th Cir. 2012)). "The standard for determining whether a plaintiff has failed to state a claim upon which relief can be granted under § 1915(e)(2)(B)(ii) is the same as the Federal Rule of Civil Procedure 12(b)(6) standard for failure to state a claim." *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012); *accord Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012) (noting that screening pursuant to § 1915A "incorporates the familiar standard applied in the context of failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)").

Every complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "When there are well-pleaded factual allegations, a court should assume their veracity, and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* The "mere possibility of misconduct" falls short of meeting this plausibility standard. *Id.*; *see also Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009).

While a plaintiff's factual allegations are taken as true, courts "are not required to indulge unwarranted inferences." *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 681 (9th

4

Cir. 2009) (internal quotation marks and citation omitted).  Indeed, while courts "have an obligation where the petitioner is pro se, particularly in civil rights cases, to construe the pleadings liberally and to afford the petitioner the benefit of any doubt," *Hebbe v. Pliler*, 627 F.3d 338, 342 & n.7 (9th Cir. 2010) (citing *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985)), it may not "supply essential elements of claims that were not initially pled." *Ivey v. Board of Regents of the University of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982).  "Vague and conclusory allegations of official participation in civil rights violations" are  not "sufficient to withstand a motion to dismiss."  *Id.*

### B.    Factual Summary

Except for eliminating allegations of retaliation related to an April 2020 transfer authorization and separating his claims for relief into three Counts, Reynolds' Amended Complaint remains dense and incorporates dozens of previously submitted and several new exhibits by reference.[2]  In essence, Reynolds asserts the same First, Fourth, Eighth, and Fourteenth Amendment challenges to his May 2019 strip search, the 2-day contraband watch, RVR violations, disciplinary convictions, and inmate appeal processing claims as asserted in his original Complaint and previously dismissed by this Court.

### 1.    Allegations Regarding Count 1

On May 28, 2019, and again on May 30, 2019, Reynolds alleges all inmates in Building C-4 were warned by control booth officers to remove all cell window covers.

---

[2] "Courts must consider the complaint in its entirety," including "documents incorporated into the complaint by reference" to be part of the pleading when determining whether the plaintiff has stated a claim upon which relief may be granted.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Schneider v. Cal. Dep't of Corrs.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

(*See* Am. Compl. at 5, ¶¶ 13, 16–17.)  On May 30, 2019, Reynolds alleges Sgt. Lam entered and instructed Correctional Officer Verdugo and other subordinates to conduct cell and strip searches of inmates in selected cells, including Reynolds' cell #128.  (*Id.*, ¶¶ 16–19.) Other inmates "stripped out," but Reynolds refused and demanded that both Verdugo and Lam cite the "constitutional justification or cause" for their search. (*Id.*at 5–6, ¶¶ 20–21.) Because Reynolds refused to strip, Lam ordered Verdugo to "pat frisk" him, and then instructed Reynolds to pass through a metal detector. (*Id.* at 6, ¶¶ 22–23.)  Reynolds alleges Lam's actions were "vindictive" and that he "conspired" against Reynolds knowing he would not clear the device due to a steel rod implanted in his leg.  (*Id.*; *see also* Ex. G, ECF No. 4-1 at 75-76.)  When Reynolds failed metal detection, Lam ordered Verdugo to cuff and escorted him to the Program Office.  (*Id.* at 6, ¶ 24.)

Upon arrival Reynolds was secured in a steel cage and instructed to put on two jumpsuits. Lam also applied a waist chain, handcuffs and leg restraints, and taped Reynolds' arms, waist and lower legs.  (*Id.* at 5, ¶ 13.)  Verdugo and two unknown officers then transferred Reynolds to Receiving and Release ("R&R") in his "Ad-Seg Apparel" where Sgt. Loop "illegally expos[ed] [him] to excessive radiation" by twice using an "Adani Low-Dose Scanner."  (*Id.* at 6–7, ¶¶ 26–27, 31.) Reynolds alleges Lt. Rodriguez then "prepared and utilized a manufactured/false (CSW) request with malice and specific intent to contrive [Reynolds] as a suspect."  (*Id.* at 7, ¶ 28.)[3]

---

[3] CSW or "contraband watch, also known as a  'body cavity search,' is a temporary confinement during which a prisoner is closely monitored and his bowel movements searched to determine whether he has ingested or secreted contraband in his digestive tract."  *Chappell v. Mandeville*, 706 F.3d 1052, 1055 (9th Cir. 2013); *see also* Ex. N, ECF No. 4-1 at 134 (citing Cal. Code Regs., tit. 15 § 3999.98).  Reynolds alleges Cpt. Sais "knowingly endorsed his approval" of Rodriguez's "manufactured false CSW request" and Warden Madden "knowingly failed to desist the CSW request."  (*See* Am. Compl. at 7, ¶¶ 29–30; *see also* Ex. P, ECF No. 4-1 at 139, "CSW Placement Authorization".).

Reynolds was then escorted to Ad-Seg where he was "received" by Lt. Din and Sgt. Edwards.[4]  (*Id.*, ¶ 32.)  Reynolds alleges Din then conducted an "unjustified unclothed body search" and placed him in a cold "isolated cell" with "nothing but an iron bench, [and] bright light." (*Id.*, ¶ 33.)

During the "2d watch," Reynolds informed the observation staff that he had to defecate.  (*Id.*, ¶ 34.)  He was then "compelled to defecate inside [] a plastic bag in front of the observation staff and Sgt. Edwards." (*Id.*)  Staff then "searched his human waste for nothing (negative results)." (*Id.*) At "3rd watch" at 4:00–5:00 p.m., Reynolds informed Officer Layvas that he again needed to defecate.  (*Id.* at 8, ¶ 35.)  He was again "compelled to defecate inside a plastic bag" in front of C/O Layvas, and Sgt. Buttler, who "searched [his] human waste for nothing (negative results)."  (*Id.*) At 8:00 p.m., Sgt. Buttler "tossed [Reynolds] a mattress."  (*Id.*, ¶ 36.) Because his lower back, arms, wrists, and legs were irritated by the restraints, Reynolds "was compelled to figure out how to lay down," "struggled to get up" and "could not sleep."  (*Id.*, ¶¶ 36–37.)[5]

On the next day, May 31, 2019, at 8:00 a.m., Sgt. Edwards confiscated his mattress (*Id.*, ¶ 38.)  During the third watch between 4:00-5:00 p.m., Reynolds again informed Layvas of his need to defecate.  Layvas and CSW Sgt. Loshek repeated the same procedures as the day before, and at approximately 8:00 p.m., Loshek told Reynolds the CSW would be terminated.  (*Id.*, ¶¶ 39–40.)  While Reynolds waited to be returned to general population, however, he claims Loshek "impeded [his] release by falsely claiming CSW policy requires urine collection."  (*Id.*, ¶ 41.)  In order to "speed up the release

---

[4] Sgt. Edwards is not named as a Defendant.

[5] At "approximately 1928 Hours" on May 30, 2019, Ad-Seg Sgt. Loshek also ordered Reynolds to "provide a Urinalysis Sample (AU) for Probable Cause due to being placed on … CSW. Reynolds refused by stating 'I'm good on all that.'"  (*See* Ex. BB, ECF No. 4-3 at 9.) Loshek "explained to Reynolds per DOM Section 52010.20 he would receive a CDCR 115 disciplinary write-up if he refused to produce the urine sample.  Reynolds again refused the order."  (*Id.*)

process," Reynolds "urinated in [a] bottle," and told Loshek "I'm going to sue you." (*Id.*, ¶ 42.) Officer Carillo then transferred Reynolds back to R&R, where he "illegally used the low-dose scanner." (*Id.*, ¶ 42.)

### 2.   Allegations Regarding Count 2

In Count 2, Reynolds claims to have been issued and convicted based on five separate "false" RVRs premised on his repeated refusals to provide urine samples after his release from contraband watch. Reynolds alleges each of these RVRs was "manufactured" or "orchestrated" to "conceal" the unlawfulness of his original strip search and CSW placement, and therefore the disciplinary convictions which resulted violate his Fourth, Eighth, and Fourteenth Amendment rights. (*See generally* Am. Compl. at 11–16; Decl. in Supp. of Am. Compl., ECF No. 7-1 at 6–8, ¶¶ 31–47.)

Specifically, Reynolds alleges he first received RVR Log No. 6857810 on June 11, 2019, issued by Sgt. Loshek and based on his May 30, 2019 refusal to provide a urine sample "for probable cause due to being placed on Contraband Surveillance Watch (CSW)." (*See* Am. Compl. at 11 ¶ 53, *see also* Ex. BB, ECF No. 4-1 at 8–21.) Reynolds claims Lt. Perez later "arbitrarily found [him] guilty for no reason," and Associate Warden Johnson "illegally" affirmed Loshek and Perez's "flagrant" acts. (*Id.* at 11, ¶¶ 54–55.)

On August 15, 2019, Reynolds alleges Lt. Ramirez "forged" his name on a mandatory random drug test list ("MDRT"), and then "orchestrated" C/O Barba to collect his urine, which resulted in a second "false" RVR, Log No. 6890922. (*Id.*, ¶¶ 56–57; *see also* Ex. BC, ECF No. 4-3 at 22–35.) Reynolds claims Lt. Sanchez also "arbitrarily found [him] guilty for no reason," and Johnson "illegally" affirmed Ramirez and Sanchez's "flagrant" acts. (*Id.*, ¶¶ 58–59.)

On January 6, 2020, Lt. Ramirez again "orchestrated" C/O Torres' "mission to collect urine" from Reynolds, "causing [] false RVR Log No. 6953012." (*Id.*, ¶ 60; *see also* Ex. BD, ECF No. 4-3 at 36–49.) Lt. Zamora too "arbitrarily found [him] guilty for no reason," and Johnson again "illegally" affirmed Ramirez and Zamora's "flagrant" acts. (*Id.*

at 11–12, ¶¶ 60–62.)

On February 17, 2020, Ramirez "orchestrated" C/O Preciado's "mission to collect urine" once again, "causing a false RVR Log No. 6972817." (*Id.* at 12, ¶ 63; *see also* Ex. BE, ECF. No. 4-3 at 50–63.)  Lt. Ruiz also "arbitrarily found [him] guilty for no reason," and Johnson yet again "illegally" affirmed Ramirez and Ruiz's "flagrant" acts.  (*Id.*, ¶¶ 64–65.)

Finally, on June 1, 2020, Lt. Ramirez again "orchestrated" C/O Hernandez's "mission to collect urine" from Reynolds causing a "false RVR Log No. 7012801." (*Id.*, ¶ 66; *see also* Ex. BG, ECF No. 4-3 at 81–95.) This time, it was Lt. Bonillas who "arbitrarily found [him] guilty for no reason," and Associate Warden Salcido who "wantonly affirmed" Ramirez's and Bonillas' "flagrant" acts.  (*Id.* at 12–13, ¶¶ 67–68.)

### 3.    Allegations Regarding Count 3

In Count 3, Reynolds alleges Defendants Juarez, Johnson, Madden, Moseley, Sinkovich, Santana, and an unidentified John Doe Appeals Coordinator violated his First, Eighth, and Fourteenth Amendment "right to appeal" regarding the strip search, CSW placement, and disciplinary conviction violations he alleges in Counts 1 and 2.  (*See id., generally* at 17–20.)  Specially, Reynolds alleges to have filed ten separate staff complaints and inmate appeals between June 26, 2019 and August 19, 2020, all of which he contends were mishandled, rejected, inappropriately scrutinized, or inadequately investigated as part of "the collusion to cover up." (*Id.* at 17–19, ¶¶ 79–89; citing Ex. BI, ECF No. 4-3 at 98–110 (CDCR 602 Log No. 19-1297); Ex. BM, ECF No. 4-3 at 117–132 (CDCR 602 Log No. 19-1418); Ex. BP, ECF No. 4-3 at 138–157 (CDCR 602 Log. No. 19-1875); Ex. BZ, ECF. No. 4-3 at 180–190 (CDCR 602 Log No. 20-0332); Ex. CA, ECF No. 4-4 at 2–19 (CDCR 602 Log. No. 20-0618); Ex. CF, ECF No. 4-4 at 50–58 (CDCR 602 Log No. 5277); Ex. CM, ECF No. 4-4 at 77–83; Ex. CO, ECF No. 4-4 at 90–97 & Ex. CS, ECF No. 4-4 at 110–116 (CDCR 602 Log No. 23290); Ex. CR, ECF No. 4-4 at 104–109 & Ex. CU, ECF No. 4-4 at 118–123 (CDCR 602 Log No. 33421).

### C.      Discussion

"Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights."  *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001).  "To establish § 1983 liability, a plaintiff must show both (1) deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law." *Tsao v. Desert Palace, Inc*., 698 F.3d 1128, 1138 (9th Cir. 2012).

### 1.      Search, CSW Placement and Conditions Claims – Count 1

With respect to his May 31, 2019 strip search, CSW placement, and the conditions of his 2-day CSW isolation, Reynolds' Amended Complaint again fails to allege plausible violations of his Fourth, Eighth, or Fourteenth Amendment rights.

### a.      Fourth Amendment Search Claims

Reynolds continues to claim Sgt. Lam, Officer Verdugo and Sgt. Loop violated his Fourth Amendment rights on May 30, 2019 by requiring him to submit to a strip search without probable cause, pat frisking him after he refused, and then "misus[ing] the CDC Department metal detector" and "low dose scanner."  (*See* Am. Compl. at 5, 9, ¶¶ 43–48.)[6]

As the Court noted in its previous Order, "[t]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer*, 468 U.S. 517, 526 (1984), and courts have recognized only limited

---

[6] To the extent Reynolds also cites the Fourteenth Amendments as the basis for his search claims, *see* Am. Compl. at 9, ¶¶ 43–47, only Fourth Amendment principles govern.  *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality) (noting that when a specific constitutional Amendment "provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.") (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

21-cv-00955-BAS-RBB

rights to bodily privacy in prison.  *See Bull v. City & Cty. of San Francisco*, 595 F.3d 964, 974–75 (9th Cir. 2010); *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988). Reynolds continues to claim that when Verdugo directed him to submit to a cell and visual strip search on May 30, 2019, he refused without first being provided some "constitutional justification or cause."  (*See* Am. Compl. at 5 ¶ 19.)  But routine visual strip searches, like the one Reynolds continues to acknowledge were being conducted throughout the C-4 Building over the course of two days, do not violate the Fourth Amendment.  *See Hudson*, 468 U.S. at 529 ("[W]holly random searches are essential to the effective security of penal institutions."); *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 327–28 (2012) ("[D]eterring the possession of contraband depends in part on the ability to conduct searches without predictable exceptions."); *Michenfelder*, 860 F.2d at 333–34 (upholding routine visual body cavity searches for contraband or weapons); *Nunez v. Duncan*, 591 F.3d 1217, 1227–28 (9th Cir. 2010) (finding federal prisoner's strip search for contraband did not violate the Fourth Amendment because controlling contraband within a prison is a legitimate penological interest and the regulation allowing visual strip searches was reasonably related to that interest).

Once Reynolds refused to "strip out," however, he contends that Sgt. Lam ordered Verdugo to "pat frisk" him and to "go through a metal detector." (*See* Am. Compl. at 6, ¶¶ 21–23.)[7] While the manner in which a bodily search is conducted may become so unreasonable that it can violate the Fourth Amendment, Reynolds still fails to allege facts to plausibly suggest the random strip search order, pat frisk, or subsequent metal detection were "excessive, vindictive, harassing, or unrelated to any legitimate penological purpose."

---

[7] Reynolds does "note" that Sgt. Lam is the only Correctional Sergeant who conduct[s] vindictive searches," and that Verdugo "approached [his] cell … under vindictive means." (*See* Am. Compl. at 5, ¶¶ 18–19.)  But he offers no further factual support for these legal conclusions.  *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Michenfelder*, 860 F.2d at 332–33; *see also Hudson*, 468 U.S. at 528 ("The uncertainty that attends random searches of cells renders these searches perhaps the most effective weapon of the prison administrator in the constant fight against the proliferation of knives and guns, illicit drugs, and other contraband."); *Thompson v. Souza*, 111 F.3d 694, 700 (9th Cir. 1997) (upholding visual strip searches conducted outside prisoner's cell as reasonably related to the legitimate penological interest in keeping drugs out of the prison); *cf. Cates v. Stroud*, 976 F.3d 972, 979–80 (9th Cir. 2020) (upholding routine suspicion-less pat-down searches and metal detector screenings as prerequisite for visitation privileges on Fourth Amendment grounds given "weighty institutional safety concerns" and because "[s]uch searches are 'relatively inoffensive' and 'less intrusive than alternative methods.'") (citing *McMorris v. Alioto*, 567 F.2d 897, 900–01 (9th Cir. 1978)).[8]

### b.   Fourteenth Amendment CSW Claims

Reynolds also continues to claim Defendants Rodriguez, Sais, Madden, and Din violated his "right to remain in general population" when they requested and authorized his CSW placement and characterizes his 2-days of confinement there as "atypical hardship" in violation of the Fourteenth Amendment. (*See* Am. Compl. at 9–10, ¶¶ 49–52.)[9] The Fourteenth Amendment provides that "[n]o state shall . . . deprive any person of

---

[8] As alleged in the original Complaint, Reynolds claims Lam knew he had an "implanted rod" in leg and that he would not clear metal detectors. (*See* Am. Compl. at 6 ¶¶ 23–24.) The May 30, 2019 CSW Placement Authorization which Reynolds submitted as an exhibit, confirms that Lt. Rodriguez and Cpt. Sais knew he "ha[d] a metal rod and bullet in his lower right tibia." His CSW placement was nevertheless authorized because "the metal detector and hand held wand … register[ed] around [Reynolds'] pelvic area." (*See* Ex. P, ECF No. 4-1 at 139.)

[9] Reynolds also claims his CSW placement violated "statutory law" and various sections of the California Penal Code. (*See* Am. Compl. at 10 ¶¶ 49–50.) But violations of state law or local law or prison regulations cannot be remedied under § 1983 unless they also violate a federal constitutional or statutory right. *See Davis v. Scherer*, 468 U.S. 183, 192

life, liberty, or property, without due process of law." U.S. Const. Am. XIV, § 1. Liberty interests may arise from the Due Process Clause or from state law. *See Hewitt v. Helms*, 459 U.S. 460, 466–68 (1983).

### i. Liberty Interests Arising from Due Process Clause

As the Court also noted in its previous Order, "lawfully incarcerated persons retain only a narrow range of protected liberty interests" under the Fourteenth Amendment itself. *Id.* at 467. Thus, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes*, 427 U.S. 236, 242 (1976). Transfer to less amenable quarters or segregation for non-punitive reasons are "ordinarily contemplated by a prison sentence." *Hewitt*, 459 U.S. at 468; *see also Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("The Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement"). Indeed, the Due Process Clause does not protect against all changes in conditions of confinement even where they "hav[e] a substantial adverse impact on the prisoner involved." *Meachum v. Fano*, 427 U.S. 215, 224 (1976).

Thus, "[o]nly the most extreme changes in the conditions of confinement," like an involuntary commitment to a mental institution, or the forced administration of psychotropic drugs, have been held to directly invoke the protections of the Due Process Clause. *See Chappell v. Mandeville*, 706 F.3d 1052, 1063 (9th Cir. 2013) (citing *Vitek v. Jones*, 445 U.S. 480, 493–94 (1980); *Washington v. Harper*, 494 U.S. 210, 221–22 (1990)). Because a "[t]emporary contraband watch does not rise to this level," Reynolds, who continues to allege to have been placed on CSW for only two days, like the plaintiff in

_____

(1984); *see also Ellis v. City of San Diego*, 176 F.3d 1183, 1189 (9th Cir. 1999) ("[S]ections of the California Penal Code ... do not create enforceable individual rights.").

*Chappell*, who was placed on contraband watch for six, still "cannot claim a liberty interest under the Due Process Clause of the Fourteenth Amendment." *Chappell*, 706 F.3d at 1062, 1064 ("An investigative contraband watch is the type of condition of confinement that is ordinarily contemplated by the sentence imposed.").

Therefore, the Court again finds that Reynolds' claims of having been transferred from the general population to a CSW isolation cell for two days fails to plausibly invoke the deprivation of a liberty interest protected by the Fourteenth Amendment itself. *See e.g., Davis v. Andrade*, 2019 WL 4879102, at *3 (E.D. Cal. Oct. 3, 2019) (finding prisoner placed on contraband watch after low dose body scan indicated he was "positive for contraband being held in his person" failed to state a "cognizable due process claim" sufficient to survive initial screening pursuant to 28 U.S.C. § 1915A).

### ii. Liberty Interests Arising from State Law

"States may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Sandin v. Conner*, 515 U.S. 472, 483–84 (1995). To determine whether the Reynolds has invoked a liberty interest with respect to his CSW placement as created by state law, the Court must determine whether the facts as alleged in his Amended Complaint are sufficient to plausibly show he was subject to restraints or deprivations which "impose[d] atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Id.* at 484; *Wilkinson*, 545 U.S. at 223 ("After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'") (quoting *Sandin*, 515 U.S. at 484).

The Court has previously recognized "[t]here is no single standard for determining whether a prison hardship is atypical and significant." *Chappell*, 706 F.3d at 1064. Even deprivations that are "concededly punitive" are not sufficient by themselves. *Sandin*, 515 U.S. at 485. Instead, the analysis is "context dependent" and "requires 'case by case, fact

by fact consideration.'"  *Chappell*, 706 F.3d at 1064 (quoting *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996); *Ramirez v. Galaza,* 334 F.3d 850, 861 (9th Cir. 2003)).  In making this determination, courts are guided by *Sandin* to inquire: "1) whether the challenged condition mirrored those conditions imposed upon inmates in administrative segregation and protective custody, and thus comported with the prison's discretionary authority; 2) the duration of the condition, and the degree of restraint imposed; and 3) whether the state's action will invariably affect the duration of the prisoner's sentence."  *Ramirez*, 334 F.3d at 861 (quoting *Sandin*, 515 U.S. at 486–87).  In sum, to invoke a state-created liberty interest, the nature of Reynolds' hardship must be alleged to "present a dramatic departure from the basic conditions of [his] . . . sentence."  *Id.*

In his Amended Complaint, Reynolds continues to claim he was placed in CSW for only two days. He does not allege any facts describing the conditions imposed upon him in Ad-Seg nor claim that that his disciplinary convictions "invariably affect[ed] the duration of [his] sentence."  (*See* Am. Compl. at 6–8); *Id*.  In *Chappell*, the Ninth Circuit held a California prisoner's temporary investigative confinement on contraband watch for a period of six days, and under conditions even more restrictive and lasting three times as long than those alleged by Reynolds in this case,[10] did not amount to a clearly established "'atypical and significant hardship' apart from the ordinary conditions of prison management."  *Chappell*, 706 F.3d at 1065.  District courts considering due process

---

[10] In *Chappell*, the prisoner was "first searched," provided two pairs of underwear, and two jumpsuits, that were both "taped at the thighs, ankles, waist, and upper arms … to close off any openings in the clothing." 706 F.3d at 1055.  He was placed in waist chains to "prevent [him] from being able to reach his rectum," and moved to "a surveillance cell where prison staff watch[ed] [him] at all times."  *Id.*  Chappell was also shackled at the ankles, alleged he was forced to "eat [his] food like a dog," and chained to the bed in an unventilated, high temperature cell, under lights that were "very bright."  *Id.*  When he needed to defecate, Chappell was required to notify staff, who brought him a plastic, moveable toilet.  *Id.*  Once he was finished, staff searched three of Chappell's bowel movements over the course of six days before releasing him.  *Id.* at 1055–56.

challenges to California's temporary CSW protocols both before and after *Chappell* have similarly found no "dramatic departures" sufficient to invoke a protected liberty interest under *Sandin*.  *See, e.g., Meraz v. Reppond,* 2009 WL 723841, at *2 (N.D. Cal. Mar. 18, 2009) (placement in a contraband watch cell for three days did not constitute an atypical and significant hardship); *Treglia v. Cate*, 2012 WL 987295, at *8 (N.D. Cal. Mar. 22, 2012) (finding three-day confinement in contraband surveillance watch, where Plaintiff was placed in continual restraints and did not have running water and a toilet, did not amount to an atypical and significant hardship); *Frye v. Oleshea*, 2012 WL 951318 (N.D. Cal. March 20, 2012) (plaintiff on "dry-cell" watch for two days failed to invoke a state-created liberty interest under *Sandin*); *Price v. Sutton*, 2020 WL 4922502, at *5 (E.D. Cal. Aug. 21, 2020) (finding prisoner's temporary CSW claims failed to state a "cognizable claim for violation of his rights to due process" and dismissing complaint *sua sponte* pursuant to 28 U.S.C. § 1915A because alleged facts did not demonstrate any "atypical and significant hardship."); *Harvey v. Burris*, 2015 WL 8178572, at *2 (N.D. Cal. Dec. 8, 2015) (finding prisoner's five-hour stay in contraband watch was "too short a time to amount to a hardship that violated his constitutional rights, either under the Eighth or Fourteenth Amendment."); *but cf. Romo v. Cate*, 2014 WL 4276071, at *12 (E.D. Cal. Aug. 29, 2014) ("Having found the operative complaint contains a plausible basis for an Eighth Amendment claim in this case, the undersigned does not find it implausible that plaintiff could also make a case that eight days on CSW was, under the conditions he personally experienced, an atypical and significant hardship that entitled him to some level of due process."), *adopted as modified*, 2014 WL 4929461 (E.D. Cal. Sept. 30, 2014).

Here, Reynolds was subjected to CSW isolation conditions for two days, and those conditions, as discussed below, do not rise to the level of an Eighth Amendment violation. *See infra* Part II.C.2.c. Therefore, Reynolds' Amended Complaint fails to plausibly allege his CSW placement amounted to the type of "atypical and significant hardship" required to invoke a protected liberty interest under California law.  *See Sandin*, 515 U.S. at 484.

### c. Eighth Amendment Conditions

Reynolds also continues to claim Defendants Rodriguez, Sais, Madden, and Din violated the Eighth Amendment by subjecting him to an "inhuman[e] CSW placement" and "inhumane conditions of confinement," "inhuman[] treatment" and by applying restraints that amounted to "corporal punishment." (*See* Am. Compl. at 10, ¶¶ 49–52.)

The Eighth Amendment prohibits the imposition of cruel and unusual punishments and "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity and decency.'" *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation omitted). In order to state an Eighth Amendment claim however, Reynolds must satisfy both the objective and subjective components of a two-part test. *See Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991); *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002). First, he must allege Defendants deprived him of the "'minimal civilized measure of life's necessities.'" *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (quoting *Wilson*, 501 U.S. at 304). When determining whether an alleged deprivation is objectively sufficiently serious to support an Eighth Amendment claim, the court must consider the circumstances, nature, and duration of the deprivation. *Johnson v. Lewis*, 217 F.3d 726, 731–32 (9th Cir. 2000). Second, Reynolds must allege facts sufficient to plausibly show each Defendant he seeks to hold liable had a "sufficiently culpable mind." *Wilson*, 501 U.S. at 297. "In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citation omitted). That is, that the official must "kn[ow] of and disregard[] an excessive risk to inmate health or safety[.]" *Id.* at 837.

District courts considering Eighth Amendment challenges to CSW placements and contraband surveillance conditions have consistently found no Eighth Amendment violations—either because the deprivations were not "sufficient serious," or because the defendant officials were not alleged to have acted with deliberate indifference. *See e.g., Centeno v. Wilson*, 2011 WL 836747, at *3 (E.D. Cal. Mar. 4, 2011) (no Eighth Amendment violation when prisoner was placed on contraband watch and forced to sleep on a cold floor without a mattress, blanket, or the ability to shower for seven days), *aff'd*,

479 F. App'x 101 (9th Cir. 2012); *Diaz v. Cate*, 2013 WL 4479262, at *3–*4 (N.D. Cal. Aug. 20, 2013) (ruling that five-day confinement in a dry cell with a portable toilet and buckets for defecating did not violate the Eighth Amendment, even though plaintiff was restrained, not allowed to shower, and was forced to eat and sleep on the floor without a blanket); *Frye*, 2012 WL 951318, at *1, *6 (finding placement of a nearly-naked prisoner in leg restraints and confining him for nearly two days in a dirty cell with no toilet access, a bucket to relieve himself, constant lighting, and no toilet paper or soap and water did not violate the Eighth Amendment); *Hefa v. Hanratty*, 2021 WL 965451, at *1 (W.D. Wash. Jan. 13, 2021) (dismissing Eighth Amendment challenge to "dry cell" contraband confinement conditions where prisoner was strip-searched, required to provide a urine sample, forced to wear a full body suit with his ankles and wrists zip-tied and taped, and held in a holding cell with no toilet or sink under surveillance for "84 hours or 3 normal bowel movements, whichever occurred first"), *report and recommendation adopted*, 2021 WL 963480 (W.D. Wash. Mar. 15, 2021); *cf. Harris v. Lappin*, 2009 WL 789756, at *10 (C.D. Cal. Mar. 19, 2009) (finding a viable Eighth Amendment claim for 11-day dry cell confinement in filthy floor covered with other inmates' waste and bodily fluids).

In his Amended Complaint, Reynolds continues to allege he was dressed in two jumpsuits, secured by a waist chain, handcuffs and leg restraints which he describes as "Ad-Seg Apparel," and twice subjected to radiation from an "Adani Low-Dose Scanner." (*See* Am. Compl. at 6–7, ¶¶ 25–27, 31.)  Reynolds was then transferred to Ad-Seg where he was "placed in a[n] isolated cell that consisted of nothing but a[n] iron bench, bright light and cold temperature." (*Id.* at 7, ¶ 33.)  When he twice reported the need to defecate, he claims he was "compelled" to do so "inside [] a plastic bag" and in the presence of observation staff, who then inspected his excrement for contraband. (*Id.* at 7–8, ¶¶ 34–35.) Overnight, Reynolds was "tossed" a mattress, but he continues to claim he was unable to sleep due to the wrist and leg restraints which irritated his lower back, wrists, arms, and legs. (*Id.* at 8 ¶¶ 36–37.)

These allegations are no different than those Reynolds pleaded in his original Complaint. The Court thus finds that although Reynolds' CSW conditions were concededly unpleasant and humiliating— they do not rise to the level of an Eight Amendment violation according to *Chappell*, *Centeno*, *Diaz*, *Frye* and *Hefa.*

Moreover, Reynolds has not amended his complaint to demonstrate any CSW escorting or observation official acted with deliberate indifference to a serious risk of harm to either his health or his safety.[11]  *See Farmer*, 511 U.S. at 834; *see also Price v. Sutton*, 2020 WL 4922502, at \*5 (E.D. Cal. Aug. 21, 2020) (finding prisoner's allegations of having been "subjected to a contraband watch under unsanitary conditions" and in the presence of a female guard subject to sua sponte dismissal pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A because "[w]hile being subjected to a contraband search may be considered a serious deprivation in itself, Plaintiff [did] not alleged facts showing that any of the Defendants had a sufficiently culpable state of mind for an Eighth Amendment violation.").

In sum, the Court finds that the CSW placement and conditions claims Reynolds alleges in his Amended Complaint "stop short" of pleading a plausible claim for relief under the Eighth Amendment.  *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557).

### 2.     "False" RVRs & Disciplinary Conviction Claims – Count 2

With respect to his allegations that Defendants Loshek, Ramirez, Barba, Torres, Preciado, and Hernandez "manufactured false" RVR Log Nos. 6857810, 6890922,

---

[11] Reynolds invokes the phrase "deliberate indifferen[ce]" with respect to Defendants Rodriquez, Sais, Madden, and Din, but he includes no factual content "that allows the court to draw the reasonable inference" that any of these officials actually "knew of and disregarded an excessive risk" to either his health or safety.  *See* Am. Compl, at 10, ¶¶ 49–52, *Farmer*, 511 U.S. at 837; *Iqbal*, 556 U.S. at 678–79 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

6953012, 6972817, and 7012081 against him as a result of his CSW isolation, and to the extent he further alleges Defendants Perez, Johnson, Sanchez, Zamora, Ruiz, Bonillas, and Salcido all "arbitrarily found [him] guilty" of refusing to submit to urine testing "for no reason" and/or affirmed the disciplinary sanctions imposed as a result of those convictions, the Court continues to find his pleading insufficient to support any plausible Fourth, Eighth, or Fourteenth Amendment claim for relief.  (*See* Am. Compl. at 11–16, ¶¶ 70–78 & Exs. BB, BC, BD, BE & BG.)

### a.   Fourth Amendment

As was true for his original Complaint, Reynolds' Amended Complaint again invokes the Fourth Amendment in the context of his RVR and disciplinary hearing claims, but he still fails to include *any* factual allegations that plausibly suggest a Fourth Amendment violation.  *See Hudson*, 468 U.S. at 525 ("The applicability of the Fourth Amendment turns on whether 'the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action.") (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)); *see also Thompson*, 111 F.3d at 696, 701–02 (rejecting a California prisoner's challenge to a strip search and a compelled "urinalysis drug test" on Fourth Amendment grounds).  Therefore, the Court again dismisses Reynolds' Fourth Amendment claims as alleged in Count 2.

### b.   Fourteenth Amendment

Reynolds also has no Fourteenth Amendment liberty interest in not being falsely accused of prison rules violations.  *See Rios v. Paramo*, 2016 WL 8731085, at *35 (S.D. Cal. July 15, 2016), *report and recommendation adopted*, 2016 WL 4709063 (S.D. Cal. Sept. 9, 2016).  Thus, insofar as Reynolds continues to claim Defendants Loshek, Ramirez, Barba, Torres, Preciado, and Hernandez "manufactured/false" RVRs accusing him of refusing to submit urine samples in violation of Cal. Dept. of Corr. & Rehab. Operations

Manual ("DOM") § 52010.20,[12] *see* Am. Compl. at 11–12, ¶¶ 53–67,[13] or that Defendant Ramirez "forged" his name on a mandatory urine testing list after he was found guilty of refusing to provide a UA sample "for probable cause due to his being placed on [CSW]" on May 30, 2019, as a result of his disciplinary conviction pursuant to RVR Log No. 6857810, *see* Am. Compl. at 11 ¶ 56, Ex. BB, ECF No. 4-3 at 9, 18, he again fails to state a plausible Fourteenth Amendment claim for relief.[14]  *See also Dawson v. Beard*, 2016 WL 1137029, at *5–*6 (E.D. Cal. Mar. 23, 2016) ("The issuance of a false RVR, alone, does not state a claim under section 1983."); *Ellis v. Foulk*, 2014 WL 4676530, at *2 (E.D. Cal. Sept. 18, 2014) (noting that claims of arbitrary action by prison officials are grounded in "'the procedural due process requirements as set forth in *Wolff v. McDonnell*.'") (quoting *Hanrahan v. Lane*, 747 F.2d 1137, 1140 (7th Cir. 1984)); *Solomon v. Meyer*, 2014 WL 294576, at *2 (N.D. Cal. Jan. 27, 2014) ("[T]here is no constitutionally protected right to

---

[12] "Inmates who refuse or are unable to provide a urine sample shall be subject to disciplinary action in accordance with [Cal. Code Regs., tit. 15 §] 3323(h)(5)." Cal. Dept. of Corr. & Rehab., Operations Manual ("DOM"), § 52010.20; *see also* Ex. AG, ECF No. 4-2 at 27.

[13]  *See also* Ex. BB (RVR Log No. 6857810), ECF No. 4-3 at 8–21; Ex. BC (RVR Log. No. 6890922), ECF No. 4-3 at 22–35; Ex. BD (RVR Log No. 6953012), ECF No. 4-3 at 36–49; Ex. BE (RVR Log No. 6972817), ECF No. 4-3 at 50–63; Ex. BG (RVR No. 7012801), ECF No. 4-3 at 81–95).

[14]  In fact, Reynolds' Disciplinary Hearing Disposition Results in RVR Log No. 6857810, dated June 29, 2019, include as part of his sanction a referral to a Unit Classification Committee ("UCC") for substance abuse treatment, and an order "to provide a mandatory random drug test [MRDT] within the next 90 day period; the SHO (Senior Hearing Officer) further advised [Reynolds] a refusal to submit to ur[i]nalysis will result in an additional Rules Violation."  (*See* Ex. BB, ECF No. 4-3 at 18.) "Inmates found guilty of a rule violation related to the use, possession, sale, distribution, or introduction of controlled substances, drugs, or drug paraphernalia; *or refusal to submit to a test for controlled substances or drugs* shall be placed on the institution's MRDT list." Cal. Dept. of Corr. & Rehab., Operations Manual ("DOM"), § 52010.20 (emphasis added). (*See* Ex. AH, ECF No. 4-2 at 26.)

be free from false disciplinary charges.") (citing *Chavira v. Rankin*, 2012 WL 5914913, at *1 (N.D. Cal. Nov. 26, 2012) ("The Constitution demands due process, not error-free decision-making.")); *Johnson v. Felker*, 2013 WL 6243280, at *6 (E.D. Cal. Dec. 3, 2013) ("Prisoners have no constitutionally guaranteed right to be free from false accusations of misconduct, so the mere falsification of a [rules violation] report does not give rise to a claim under section 1983.") (citing *Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989) and *Freeman v. Rideout*, 808 F.2d 949, 951–53 (2d Cir. 1986)).

### c.  Eighth Amendment

Reynolds' renewed claims that his false RVRs, and the disciplinary hearings, convictions, and sanctions which resulted, constitute "cruel and unusual punishment" likewise fail to state a plausible Eighth Amendment claim.   (*See* Am. Compl. at 11, 14–16, ¶¶ 70–78.)  "After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quotation omitted).  The Eighth Amendment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement.  *See Farmer*, 511 U.S. at 832; *see also Rhodes v. Chapman* ("*Rhodes II*"), 452 U.S. 337, 347 (1981).  Prison officials must ensure prisoners are not deprived of adequate shelter, food, clothing, sanitation, medical care, or personal safety, *Johnson*, 217 F.3d at 731 (quotation marks and citations omitted), but "not every injury that a prisoner sustains while in prison represents a constitutional violation." *See Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006).  Instead, a prisoner claiming an Eighth Amendment violation must allege facts to plausibly show:  (1) the deprivation he suffered was "objectively, sufficiently serious;" and (2) that prison officials acted with deliberate indifference to a serious risk to his health or safety in allowing that deprivation to take place.  *Farmer*, 511 U.S. at 834; *Thomas v. Ponder*, 611 F.3d 1144, 1150–51 (9th Cir. 2010).

21-cv-00955-BAS-RBB

Nothing in Reynolds' Am ended Complaint, Declaration, or exhibits plausibly supports his contentions that Defendants' decisions impose various disciplinary sanctions against him as a result of his repeated refusals to submit to urinalysis testing constituted "objectively, sufficiently serious" deprivations under the Eighth Amendment. *Farmer*, 511 U.S. at 834. Post-conviction "[c]onditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes II*, 452 U.S. at 347. But to "the extent that … conditions are [merely] restrictive [or] even harsh, they are part of the penalty that criminal offenders pay for their offenses against society," and do not offend Eighth Amendment principals. *Id.* "[O]nly minimal life necessities" like food, clothing, shelter, medical care, and safety are protected by the Eighth Amendment. *Puckett v. Houston*, 2017 WL 2619121, at *3 (E.D. Cal. June 16, 2017). As the Court noted in its previous Order, a prison official's decision to charge an inmate with disciplinary violations based on his refusal to submit to urinalysis testing as authorized by Cal. Code Regs., tit. 15 § 3323(h)(5)[15] simply does not involve nor deprive him of a constitutionally protected basic human need and thus does not rise to the level of cruel and unusual punishment. *See e.g., Collins v. Williams*, 536 F. App'x 706, 707 (9th Cir. 2013) (finding that "neither the issuance of disciplinary charges of which Collins was later acquitted—nor his placement in administrative, protective, and disciplinary segregation for almost six months— constituted cruel and unusual punishment."); *Negrete v. Lewis*, 2015 WL 4086302, at *3 (N.D. Cal. July 6, 2015) (finding prisoner's claims of having been subjected to "false" disciplinary charges which subjected him to the stress and fear of potential prison gang validation as a result failed to state an Eighth Amendment violation).

---

[15] Cal. Code Regs., tit. 15 § 3323(h)(5) sanctions a 0–30 day "credit forfeiture" for a "Division F Offense" based on an inmate's "[r]efus[al] to provide a urine specimen for the purpose of testing for the presence of controlled substance(s) or alcohol." Reynolds alleges to have suffered multiple "credit loss[es]" as the result of his several disciplinary convictions. (*See* Am. Compl. at 14–16, ¶¶ 71–77.)

Nor has Reynolds alleged facts sufficient to plausibly show that any Defendant acted with deliberate indifference to a serious risk to Reynolds' health or safety, either by issuing RVRs which charged him with refusing to provide urine samples, or by finding him guilty as a result of his refusals. *See Farmer*, 511 U.S. at 837; *see also Ivy v. Wingo*, 2020 WL 5709278, at *8 (S.D. Cal. Sept. 24, 2020) (*sua sponte* dismissing prisoner's conclusory challenge to disciplinary conviction as "cruel and unusual punishment" pursuant to 28 U.S.C. §§ 1915(e)(2) & 1915A).

Therefore, the Court again finds Reynolds' Eighth Amendment claims involving his RVRs and disciplinary convictions as alleged in Count 2 fail to state a claim upon which § 1983 relief can be granted.

### 3.    Inmate Appeal Processing Claims – Count 3

To the extent Reynolds claims in Count 2 that Defendants Juarez, Madden, Johnson, Moseley, Sinkovich, and John Doe Office of Appeals Coordinator violated the First, Eighth, and Fourteenth Amendments by rejecting his CDCR 602 inmate appeals and staff complaints, by failing to forward them to the proper "hiring authorities," by failing to properly "scrutinize" or "investigate" his claims, and by failing to correct "obvious" errors as part of a "collusion" to "cover up," he again fails to allege any plausible claim for relief. (*See* Am. Compl. at 17, 20, ¶¶ 90–93.)

#### a.    First Amendment

As the Court noted in its previous Order, "[p]risoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so." *Watison*, 668 F.3d at 1114 (citing *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009)). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably

advance a legitimate correctional goal." *Rhodes v. Robinson ("Rhodes III")*, 408 F.3d 559, 567–68 (9th Cir. 2005).

Reynolds adequately alleges he filed multiple staff complaints and inmate grievances related to his CSW and subsequent RVRs. *See* Am. Compl. at 17–20; *Watison*, 668 F.3d at 1114 (inmate grievance is protected conduct).  However, he does not allege any Defendant took adverse action against him *because* he filed these grievances and does not claim to have been chilled from exercising any constitutional right.  *See Gunn v. Olmstead,* 2021 WL 3048359, at *3 (E.D. Cal. July 20, 2021) ("To the extent plaintiff may be attempting to allege that his grievances were denied in retaliation for filing the grievances in the first place, the denial of a grievance does not constitute an adverse action that is more than *de minimis* and is not sufficient to deter a prisoner of "ordinary firmness" from further First Amendment activities.") (citing *Watison*, 668 F.3d at 1114); *see also Burciaga v. California Dep't of Corr. & Rehab.*, 2019 WL 8634165, at *8 (C.D. Cal. Sept. 5, 2019) ("Plaintiff was not forced to abandon his First Amendment right; rather, he pursued it individually ... [and] does not explain how [Defendants'] instruction[s] to file his administrative grievance [differently]" resulted in the loss of a potential claim for relief).).

Reynolds further fails to allege any appeal official or reviewer's actions, either with respect to the processing of his grievances or with respect to their ultimate dispositions, failed to "advance legitimate penological goals, such as preserving institutional order and discipline." *See Barnett v. Centoni*, 31 F.3d 813, 815–16 (9th Cir. 1994) (per curiam); *Watison*, 668 F.3d at 1114 (citing *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985) (plaintiff must allege "that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution....")); *see also Perez v. Diaz*, 2021 WL 6496781, at *10 (C.D. Cal. Nov. 29, 2021) (*sua sponte* dismissing prisoner's claim that officials "arbitrarily rejected" his appeals "contrary to regulations" and as part of a

conspiracy against him), *report and recommendation adopted*, 2022 WL 715733 (C.D. Cal. Mar. 9, 2022).[16]

Therefore, the Court finds Reynolds' First Amendment claims as alleged in Count 3 fail to state a claim upon which relief can be granted and must be dismissed.

### b.   Fourteenth Amendment

Reynolds also fails to allege any viable Fourteenth Amendment violation with respect to Defendants' alleged failure to properly process his multiple staff complaints and grievances.

As the Court also noted in its previous screening Order, prisoners have no protected interest in an inmate grievance procedure. *See Ramirez*, 334 F.3d at 860 ("[I]nmates lack a separate constitutional entitlement to a specific grievance procedure."); *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988) (there is no protected liberty interest to a specific grievance procedure). Thus, Defendants Juarez, Madden, Johnson, Moseley, Sinkovich, and Doe's alleged failures related to the acceptance, rejection, or ultimate denial of his staff complaints and grievances, without more, are not actionable under § 1983. *See Am. Compl. at 17–20, ¶¶ 79–93; Ramirez*, 334 F.3d at 860; *Evans v. Skolnik*, 637 F. App'x 285, 288 (9th Cir. 2015) ("An allegation that a prison official inappropriately denied or failed to adequately respond to a grievance, without more, does not state a claim under § 1983."); *Wilhelm v. Aung*, 2021 WL 877011, at *3 (E.D. Cal. Mar. 9, 2021) ("[T]here are no constitutional requirements regarding how a grievance system is operated; the prison grievance procedure does not confer any substantive rights upon inmates and actions in

---

[16] To the extent Reynolds explicitly alleges officials "failed to forward" his complaints "to the Hiring Authority for review as directed by state regulations," *see* Am. Compl. at 17–19, ¶¶ 79, 80, 83, 84, 86, 88, alleged violations of prison policy–without more--do not state a claim for any violation of federal constitutional rights, or federal statutory rights, and therefore are not actionable allegations under § 1983. *See Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009).

reviewing appeals cannot serve as a basis for liability under section 1983."); *Wright v. Shapirshteyn*, 2009 WL 361951, at *3 (E.D. Cal. Feb. 12, 2009) ("[W]here a defendant's only involvement in the allegedly unconstitutional conduct is the denial of administrative grievances, the failure to intervene on a prisoner's behalf to remedy alleged unconstitutional behavior does not amount to active unconstitutional behavior for purposes of § 1983."); *Ivy*, 2020 WL 5709278, at *7 (dismissing prisoner's claims against appeals officials alleged to have "failed to correct" other official's "errors" via CDCR 602 inmate appeal procedures pursuant to 28 U.S.C. § 1915(e)(2) and § 1915A); *Thomas v. Matevousian*, 2018 WL 1452261 at *4 (E.D. Cal. Mar. 21, 2018) ("Actions in reviewing a prisoner's administrative appeal generally cannot serve as the basis for liability in a section 1983 action."); *Phillipi v. Patterson*, 2014 WL 11774836 at *3 (E.D. Cal. Aug. 1, 2014) ("[D]enial of an inmate appeal ... does not state a cognizable constitutional violation"), *aff'd*, 599 F. App'x 288 (9th Cir. 2015); *Davis v. Penzone*, 2017 WL 8792541, at *5 (D. Ariz. July 25, 2017) (prison administrators and other supervisors are not per se liable for an alleged violation of a prisoner's federal constitutional rights simply by failing to grant his "grievances or grievance appeals.").

### c.    Eighth Amendment

Reynolds also cites the Eighth Amendment as a basis for relief in Count 3, and alleges Defendants Juarez, Madden, Johnson, Moseley, Sinkovich, and Doe's "refusals" and "failures" with respect to either the processing or disposition of his staff complaints and appeals constitute "deliberate indifference." *See* Am. Compl. at 17, 20 ¶¶ 90–93.

The Eighth Amendment protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement. *Morgan*, 465 F.3d at 1045. "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson*, 501 U.S. at 298 (quoting *Rhodes II*, 452 U.S. at 347) (citation omitted). Those necessities include "adequate shelter, food, clothing, sanitation, medical care, and personal safety." *Johnson*, 217 F.3d

at 731–32 (quotations and citations omitted). "The Eighth Amendment does not guarantee vindication for Plaintiff's inmate appeals." *Saenz v. Spearman*, 2009 WL 2365405, *6 (E.D. Cal. July 29, 2009). "Screening-out, cancelling, rejecting or denying an inmate appeal 'does not result in the denial of the minimal civilized measure of life's necessities,' even if the justification for the screen-out[, cancellation, rejection or denial] is illegitimate." *Millare v. Stratton*, 2017 WL 9604609, at *9 (S.D. Cal. Feb. 28, 2017), *report and recommendation adopted*, 2017 WL 1277798 (S.D. Cal. Apr. 6, 2017).

Therefore, to the extent Reynolds claims Defendants Juarez, Madden, Johnson, Moseley, Sinkovich, and Doe improperly processed or denied his CDCR 602 inmate appeals challenging the actions of the remaining Defendants as alleged in Count 1 and 2, he fails to state a claim upon which § 1983 relief may be granted.

### d. Conspiracy

Finally, to the extent Reynolds seeks to plead an independent claim of conspiracy by alleging Juarez, Madden, Johnson, Moseley, Sinkovich, and Doe committed acts of "collusion" and acted "in cahoot[s]" by denying his grievances in an effort to "cover up the case," *see* Am. Compl. at 20, ¶¶ 90–92, he also fails to state a plausible claim for relief. Conclusory allegations of conspiracy are insufficient. *See Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980); *see also Karim-Panahi v. Los Angeles Police Dep't,* 839 F.2d 621, 626 (9th Cir. 1988) (dismissing amended complaint that "contain[ed] legal conclusions but no specification of any facts to support the claim of conspiracy."). Instead, to allege a claim of conspiracy under § 1983, a plaintiff must allege facts with sufficient particularity to show an agreement or a meeting of the minds to violate his constitutional rights. *Margolis v. Ryan*, 140 F.3d 850, 853 (9th Cir. 1998); *Woodrum v. Woodward County*, 866 F.2d 1121, 1126 (9th Cir. 1989). "Vague and conclusory allegations of official participation in civil rights violations," like those included by Reynolds here, "are not sufficient to withstand a motion to dismiss." *Ivey,* 673 F.2d at 268; *see also Saray v. Diaz*, 2021 WL 6804210, at *12 (C.D. Cal. Nov. 29, 2021) (dismissing prisoner's claims that officials "joined [in] [a] conspiracy ... to arbitrarily reject and deny group appeals" for

failure to state a claim), *report and recommendation adopted*, 2022 WL 356564 (C.D. Cal. Feb. 4, 2022).

For these reasons, the Court finds Reynolds' Amended Complaint fails to state plausible claims for relief under the First, Fourth, Eighth or Fourteenth Amendments as to any Defendant and concludes that *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and § 1915A(b)(1) of the Amended Complaint is warranted. *See Lopez*, 203 F.3d at 1126–27; *Rhodes I*, 621 F.3d at 1004.

### D.    Leave to Amend

On September 29, 2021, the Court explained Reynolds' original pleading deficiencies, and because it was not absolutely clear he could not allege additional facts to state plausible First, Fourth, Eighth or Fourteenth Amendment claims for relief, granted him leave to amend.  (*See* ECF No. 6 at 27 (citing *Aktar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012)). Despite having an opportunity to amend, Reynolds again failed to adequately plead a constitutional claim for relief against any Defendant.  Therefore, the Court finds further amendment would be futile and declines to award leave to amend.  *See Gonzalez v. Planned Parenthood*, 759, F.3d 1112, 1116 (9th Cir. 2014) ("'Futility of amendment can, by itself, justify the denial of . . . leave to amend.'") (quoting *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995)); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) ("[W]here the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, [t]he district court's discretion to deny leave to amend is particularly broad." (internal quotation marks omitted) (second alteration in original)).

//

//

//

//

//

**III.   CONCLUSION AND ORDER**

Accordingly, the Court **DISMISSES** this civil action *sua sponte* without further leave to amend for failure to state a claim upon which § 1983 relief can be pursuant to 28 U.S.C. § 1915(e)(2)(B) and § 1915A(b), **CERTIFIES** that an IFP appeal would not be taken in good faith pursuant to 28 U.S.C. § 1915(a)(3), and **DIRECTS** the Clerk of Court to enter a final judgment of dismissal and to close the file.

**IT IS SO ORDERED.**

**DATED: March 23, 2022**

Hon. Cynthia Bashant
United States District Judge